JOHANN HOCH

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed December 20, 1905—Rehearing denied Feb. 8, 1906.*

1. CRIMINAL LAW—*competency of second wife as a witness is a question for the court.* When a second wife is offered as a witness in a criminal prosecution against her husband, who, it is claimed, has another wife living and undivorced, the question of her competency is for the court, and in deciding that question the court is not only the judge of the law, but also of the questions of fact necessary to be determined.

2. SAME—*alleged wife is competent to testify if former wife is living.* In determining the competency of an alleged wife as a witness the court must act upon the evidence as presented at the time of the ruling, and if there is evidence establishing a former marriage of the accused and that the first wife is still living and undivorced it is not error to permit the wife of the bigamous marriage to testify, but all questions of fact as to either marriage must be left to the ultimate determination of the jury, under proper instructions.

3. SAME—*first marriage cannot be shown by testimony of bigamous wife.* A woman who has been married to accused is *prima facie* his lawful wife and incompetent to testify against him until the fact that the marriage was bigamous has been established, in which case she becomes competent to testify as to all matters except the fact of the first marriage, which must be established by other evidence.

4. SAME—*proof that first wife is living and not divorced overcomes all presumptions.* Proof that the accused had been married before and that the first wife is living and undivorced overcomes all presumptions in favor of the validity of his subsequent marriage to the person offered as a witness against him, including any presumption as to the death or divorce of the first wife.

5. SAME—*when admission in evidence of statements of accused is not error.* Admitting in evidence statements made by the accused after being warned that whatever he said might be used against him is not error, as being a violation of the constitutional guaranty against an accused person being compelled to testify against himself, particularly where none of the statements are in the nature of admissions or confessions of guilt as to the crime charged, being only explanations of certain of his acts.

6. SAME—*when remarks of court are not error.* Remarks by the court repeating correctly what a witness had just said when counsel repeated the question a second time, and in suggesting a more perfect translation of the statement of a witness who was testifying through an interpreter, are not error.

7. SAME—*court may state his conclusion as to a matter not concerning the jury.* In passing upon the admissibility of secondary evidence of the contents of a letter which the witness has stated was destroyed, it is not error for the court, when counsel said to the witness, in substance, that she could find the letter if she searched for it, to say, "It was destroyed, if I understand it correctly."

8. SAME—*corpus delicti may be established by circumstantial evidence.* While the *corpus delicti* must be clearly established, it may be proved by circumstantial evidence.

9. SAME—*what proof authorizes conviction.* Conviction of the accused of the crime of poisoning his wife is authorized where there is direct evidence of the fact of her death and that sufficient arsenic was found in her body to have produced death if administered in her lifetime, which the evidence tends, beyond reasonable doubt, to show was done, and where it is shown, by a system of exclusion, that no person other than the accused administered the arsenic, and that the accused had the arsenic in his possession, had no affection for his wife and had opportunity and motive for the commission of the crime.

10. SAME—*when sentence is a sufficient judgment.* In the absence of a statutory requirement it is not necessary that the court should, before sentence, find as its independent judgment, upon the facts, that the accused is guilty, and it is sufficient if the verdict of the jury determines the character of the crime and the penalty and the court pronounces sentence on the verdict.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. GEORGE KERSTEN, Judge, presiding.

FRANK D. COMERFORD, and J. JULIUS NEIGER, for plaintiff in error.

W. H. STEAD, Attorney General, and JOHN J. HEALY, State's Attorney, (GEORGE B. GILLESPIE, HARRY OLSON, and THOMAS J. HEALY, of counsel,) for the People.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

Johann Hoch, plaintiff in error, was indicted in the criminal court of Cook county for the murder of Marie Walcker Hoch by poisoning with arsenic. He was found guilty by a jury and his punishment was fixed at death. The court overruled motions for a new trial and in arrest of judgment and sentenced him in accordance with the verdict. The record is before us for review upon a writ of error sued out by him, which was made a *supersedeas*.

There was practically no controversy at the trial as to the facts, and the only disagreement between witnesses was in the opinions of experts as to the cause of death. The questions to be considered by us are, whether errors prejudicial to the defendant were committed upon the trial and whether the facts proved justified the conclusion of guilt.

The facts proved are, in substance, as follows: On October 20, 1904, the defendant was married under the name of John Schmidt, in Philadelphia, to Caroline Streicher. He lived with her eleven days and deserted her on October 31. On November 8, 1904, he appeared in Chicago at the home of Johanna Reichel, who had known him about nine years and who kept a boarding and rooming house at 458 Milwaukee avenue. The next day, November 9, he went to a hotel kept by Mrs. Katie Bowers at 674 East Sixty-third street and there registered as J. Hoch, St. Louis, Missouri. He told Mrs. Bowers that he worked at the Pullman shops and was a foreman there but was away on a two weeks' vacation. He remained at the hotel ten days, and during that time, on November 16, he inquired at the Chicago City Bank, 6225 South Halsted street, for Mr. Vail, the owner

of a cottage at 6430 Union avenue, stating that he and his wife had been out house hunting, and as they came down Union avenue they noticed the house for rent. He gave the name of Mr. Hoch to Vail, who was connected with the bank, and was told that the rent was $21.50 a month. Vail said that he did not know anything about him, and he said that he was working for Armour & Co. in the canning department; that he had twenty-five or thirty men in his employ and was getting a salary of $125 a month; that he was moving from 646 East Sixty-third street, and that Vail could go to Armour & Co. or the place on Sixty-third street to look him up. He then showed his hands to Vail, and as they bore callous marks Vail rented the house to him without further inquiry. A lease was made out, which he signed with the name of Joseph Hoch, and he paid in advance the rent from November 16 to January 1, following. Mr. Vail went to the cottage a few days afterward, when Hoch met him and told him his wife was in Milwaukee. About November 20 the defendant bought from a house furnishing company a bill of furniture for the cottage, amounting to $120, and told the salesman that he had been living as a widower for four years at 6430 Union avenue; that he owned the cottage and was just contemplating again entering on the sea of matrimony. He paid $50 at that time, $50 more the second day afterward and $20 when the furniture was delivered at the house. A few days afterward, on December 3, he published in the *Abend Post,* a German evening paper published in Chicago, an advertisement in German, of which the following is a translation:

"*Matrimonial.*—Widow, without children; the end of the thirties; German; own home; wishes acquaintance of a lady; object, matrimony. Address M422, *Abend Post.*"

Marie Walcker was about forty-six years of age and had been divorced from her first husband. She had made her living by washing, house cleaning and doing general work. At the time the advertisement was published she owned a little

candy store at No. 12 Willow street. She answered the advertisement by a letter written for her by her sister, Bertha Sohn, a translation of which is as follows:

"*Dear Sir*—In answer to your honorable advertisement, I hereby inform you that I am a lady standing alone. I am forty-five years of age. I have a small business, also a few hundred dollars— a little fortune—a few hundred dollars. If you are in earnest I tell you I shall be. I may be spoken or seen at any time during the day. Address No. 12 Willow street.    MARIE WALCKER."

In response to the letter defendant came to the candy store on Tuesday, December 6. He stated to Marie Walcker that he was looking for a wife; that his wife died two years previous after a sickness of eighteen years; that he was a rich man, with $8000 in money, a nice house and a big lot on Union avenue. She told him if that was true it was all right. There was a bed-room and a kitchen back of the store, and the defendant drank coffee in the kitchen during the afternoon with Marie Walcker and a friend, Mrs. Knipple, and defendant talked about his wealth and asked Marie Walcker if she liked him, and she replied yes, if he liked her. On the next day, Wednesday, he called again at the store and took Mrs. Walcker out to show her his house and lots. They went about ten o'clock and returned about four in the afternoon, leaving Mrs. Knipple in the store. He visited the candy store again on the 8th or 9th and took supper there, and again talked about his property and his wealth, and spoke about having paid $500 to fix up his house, and that his father, in Germany, was a very old man and he would be an heir of $15,000. On Saturday, December 10, defendant came to the store to go to the court house for a marriage license and to be married. Mrs. Walcker had $270 in a savings bank and $80 hid under the mattress in her bed. She told her friend, Mrs. Knipple, to take good care of her money, and Mrs. Knipple said she had better take the money along. She had sold the store that morning for $75, and she gave that money to the defendant, and the $80 she had hid under the mattress, and her bank book. They then went

down town and were married, and went to the bank, where Mrs. Hoch drew the $270 and gave it to the defendant. They then went to the home of the sister, Bertha Sohn, at 423 Sedgwick street, and remained until about eleven o'clock. On the following Monday, December 12, defendant and Mrs. Hoch came to Sohn's about noon and remained until nine or ten in the evening. Mrs. Hoch had another sister, Mrs. Amelia Fischer, with whom she had not been on good terms, and on that visit it was stated that Mrs. Fischer had left nine children in Germany with only ten marks and had come to America and brought one child and about one thousand marks with her. Defendant condemned the conduct of Mrs. Fischer, and in the conversation learned that she had money in the same bank as Mrs. Hoch. Mrs. Fischer lived at 372 Wells street, in a flat, where she let rooms. About the same time defendant and Mrs. Hoch went to the house of Ella Held, at 241 Vine street, to learn the address of Mrs. Fischer. It happened that Mrs. Fischer was at the house when they came and Mrs. Held introduced her to Mr. Hoch. At his request the two sisters shook hands and became friends again. During that week Mrs. Knipple called at 6430 Union avenue with her two daughters and found Mrs. Hoch sitting in a rocking chair quite sick and pale, with sunken eyes. On Sunday, December 18, Mrs. Sohn and her family went to defendant's house and found her sister looking very badly, and she had eruptions about her mouth. The next day defendant and Mrs. Hoch came to visit Mrs. Sohn, and Mrs. Hoch had the eruptions about her mouth and looked very yellow, and had to run to the closet very frequently. Mrs. Sohn invited them to spend the holidays there with them, but the defendant would not promise, saying many things might happen. On Tuesday, December 20, the defendant inquired at a drug store for a doctor, and Dr. Joseph Reese, who had an office there, was recommended. He called Dr. Reese to attend Mrs. Hoch, and the doctor found her complaining of severe pains in the

lower abdominal or pelvic region, and unable to control the urine and suffering great pain and burning from it. The defendant purchased at the drug store a two-quart fountain syringe and rubber sheeting for the bed. The doctor gave a prescription to relieve the symptoms which manifested themselves, and from that time up to and including January 10 he called on the patient daily and prescribed from time to time. About the commencement of the illness defendant went to a saloon and got a quart bottle of seltzer water, and told the bar-tender to keep plenty of it on hand. He got seltzer water at different times, amounting to four quarts in all, which Mrs. Hoch drank, but the doctor said he did not direct him to give her seltzer water. On Wednesday, December 21, Mrs. Sohn received a letter from defendant, saying that his wife was sick and that the doctor had ordered injections, and requested Mrs. Sohn to go to Mrs. Knipple and see if she would come to the house. Mrs. Sohn thereupon went to the house and found her sister in bed, appearing to be very ill. She complained of fearful pains in the abdominal region and Mrs. Sohn understood that the urine was suppressed. The defendant said that the doctor had ordered the body to be flushed out with soap and water and salt, and he prepared an enema and produced the syringe with which Mrs. Sohn administered it. After that, frequent enemas were given during the entire illness. The doctor did not prescribe or direct the giving of them, but on one occasion when a nurse, who had been told that the doctor prescribed them, spoke to him about it, he assented or said to give her enemas when necessary. Before her marriage Mrs. Hoch had been in uniform good health, and, although not particularly robust in appearance, was healthy and able to do hard physical labor and had not suffered from anything except an occasional headache. Her symptoms continued practically the same until her death. She suffered great pain in the abdomen, with incontinence of urine and a burning sensation from it. She was pale and yellow and vomited frequently,

most of the time being unable to retain anything on her stomach. She was very restless and nervous and had a violent thirst. Her tongue was coated and there were eruptions about her mouth, and she had frequent fainting spells and great weakness. Her temperature was normal or below normal, and she had a tingling sensation in the extremities and felt as though ants were crawling through her body. In addition to the seltzer water she drank a great deal of water and iced milk and some coffee and soup, but she usually vomited up whatever she drank.

Two or three days after the first visit of Mrs. Sohn the defendant again wrote her, requesting her to come to the house, saying that no improvement had taken place in his wife's condition; that she must recover if it cost him thousands and thousands of dollars; that he thought he had a healthy wife, and that he had had very much misfortune in his life in that way and now it had happened again. Mrs. Sohn went to the house and found her sister very sick with the same symptoms as before, and in great pain. The defendant told her that the doctor had ordered enemas, and she gave one which was prepared by the defendant. Mrs. Hoch was taking pills, which defendant said were given to induce sleep. Her pains were very severe and she complained of a crawling sensation. She was given coffee by the defendant, and he also made some broth, of which they all partook, but Mrs. Hoch vomited it up. Mrs. Fischer received two letters from the defendant, and after receiving the second one went to see her sister and found her complaining of great pain in the lower part of the stomach, and the defendant then said that she had some kind of kidney disease. Defendant complained that his first wife had been sick eighteen years and that he thought he had now got a healthy woman but was disappointed. After her return home Mrs. Fischer sent her picture to her sister and the defendant as a New Year's present. Mrs. Fischer then received a letter from the defendant expressing thanks for the picture and saying that he was

going to carry it on his breast, and that she should send another to her sister. The doctor diagnosed the trouble as nephritis, which is another name for inflammation of the kidneys or Bright's disease, and cystitis, which is inflammation of the bladder. He wanted a professional nurse, and one was employed on January 5 who remained until the night of the 10th. By direction of the doctor she irrigated the bladder by the use of a catheter and gave douches of hot water, and while there she also gave enemas and cared for the patient. On the 6th or 7th of January Mrs. Fischer came again, when the defendant said that he had kept her picture for himself, and she said that the picture was for both of them. Mrs. Hoch was then very thirsty and spoke of the crawling and an itching in the fingers, and complained of pain, and vomited often. On that occasion defendant accompanied Mrs. Fischer to the car, and on the way said that if he had met her four weeks sooner he would have married her. The next day Mrs. Fischer came again and found her sister in the same or a worse condition. She vomited a good deal and could not retain either water or milk. On one of her visits Mrs. Fischer brought a squab for her sister, and it was cooked and the patient ate some of it. A few days after the nurse came Mrs. Hoch wanted to have her discharged on account of the expense, and the defendant saw the doctor about it and she was retained. The defendant was very attentive to his wife during the whole illness, and would kiss her in the morning and call her endearing names, and expressed great anxiety that she should be cared for regardless of expense. Mrs. Fischer was there a number of times and prepared food and did washing and ironing, and about January 10, before the nurse left, Mrs. Hoch became jealous of her sister and of defendant's attentions to her. The nurse left on the evening of January 10, but expressed a willingness to come back if she was wanted, provided Mrs. Fischer was not there. After the nurse left, the doctor did not return until the morning of January 12, af-

219—18

ter Mrs. Hoch was dead. During the sickness Mrs. Knipple called, and Mrs. Hoch asked the privilege of talking to her alone, but the defendant would not permit it. On the evening of January 11, the next day after the nurse had gone, Mrs. Hoch said to the defendant to go and marry Mrs. Fischer,—to marry her after she was dead. She called Mrs. Fischer a human sow, and told her that she could take him. Mrs. Fischer was offended and declared that she would never cross the threshold again, but it was finally decided that she should stay there that night, and she went down-stairs and laid down on a lounge. She heard high words between the defendant and Mrs. Hoch, who said to him that he could go and take her and marry her if he wanted to and could marry her after she was dead. About 5:30 in the morning of January 12 the defendant came down-stairs and told Mrs. Fischer that his wife was worse and that he was going for the doctor. He was gone for a while and telephoned the doctor, and when he returned he went up-stairs and told Mrs. Fischer to come up. Mrs. Hoch was lying there dead. On that morning defendant and Mrs. Fischer took out the bed clothes and were straightening things up about the house when the defendant proposed marriage to her. Mrs. Fischer replied that her sister was not buried yet and it was not time to talk about a matter of that kind, but the defendant said that that made no difference,—that the dead belonged to the dead and the living to the living. Mrs. Fischer declined to answer at that time. Defendant said that he was a man of means, worth about $30,000 or $40,000; that he would rent the house for $25; that the house cost him $4000, of which he paid $3000 in cash and owed $1000. He took out a paper and read from it to justify his statement, and marked out a corner lot, claiming that it contained six or eight lots in one, and said that he intended to rent the cottage until Mrs. Fischer's family came back from Germany, and then he would build a three-story brick house on the corner; that they would open a hotel and would run it

together, and he hoped they would be able to arrange every-
thing within a week.   He said it would be better to keep
everything quiet in regard to the marriage and they would
go to Germany for a trip.   The doctor made a death certifi-
cate stating that nephritis and cystitis were the cause of
death.   The funeral took place on Sunday, January 15, and
the body was buried in Oakwoods cemetery.   After the fu-
neral Mrs. Sohn spoke to the defendant about some insur-
ance of $75 of the deceased, on which the premium was ten
cents a week.   He said that he did not believe the insurance
premiums had been paid during the sickness;   that he did
not want to make any money out of the woman;   that if
there was any money she could have it;   that if he had died
his wife would have received about $25,000, as he had made
her his sole heir.   The next day, Monday, January 16, the
defendant and Mrs. Fischer agreed to be married, but the
defendant said he could not go away until the matter of the
house was settled, and that he owed $1000 and could not
rent it until he had paid it.   Mrs. Fischer said if there was
no other way out of it she had a little money.   Defendant
said that his father lived in Paris and they would go from
there to Germany, and he would inherit from $15,000 to
$20,000 from his father, who was eighty-one years old.   He
promised her by all that was holy to re-pay her money as
soon as he got his money from some vacant lots.   She had
in the bank $893, of which $750 belonged to her and the rest
to her daughter.   Defendant said that he did not want to re-
ceive the money until they were married.   They were mar-
ried at Joliet on Wednesday, January 18, and the next day
they went to the bank and she drew $750, which she gave to
him.   He said it would be better if she got the money on
that day, as he could pay his bills on the house and get it
rented.   They then went to 372 Wells street, to Mrs. Fisch-
er's flat.   Mrs. Sauerbruch, who occupied one of the flats,
opened the door and met them in the hall and told them not
to go in there;   that Mrs. Sohn was in there and was talk-

ing about defendant and said that he poisoned her sister; that he was a swindler, and that she had found out a good deal about him. He was agitated, and Mrs. Fischer Hoch told him if he was not conscious of any wrong he ought to go in, but he said that he would not come in just now,—that he was feeling badly and would sit down for a minute. He remained in the parlor and Mrs. Fischer Hoch went into the other room, but returned in a few minutes and found that the defendant had gone. The defendant went to the boarding house of Johanna Reichel, on Milwaukee avenue, before referred to, and then absconded. He was found at No. 546 West Forty-seventh street, New York City, under the name of Henry Bartells. Among other effects in his possession there was a fountain pen. There was no pen in the holder and it was not used as a pen, but the reservoir contained fifty-eight grains of arsenic. On January 21, two days after the scene at the flat, the body of Mrs. Walcker Hoch was exhumed and a post-mortem examination was held, when the stomach, with the contents, kidneys, liver and spleen were removed. There were no more changes in the vital organs than are quite frequent in persons of her age and none of them showed any disease sufficient to cause death. In the stomach arsenic was present in the proportion of 7.6 grains in the entire stomach and 1¼ grains in the liver. The body was again exhumed on April 24, 1905, when half of the bladder, a portion of the heart and a large portion of the intestines were removed and afterward examined. Arsenic was found, in the form of a white powder, in the folds of the colon, mingled with blood and mucous. The body had been embalmed with letheform, which does not contain arsenic, and the embalmer had not had or used any embalming fluid which contained arsenic. None of the medicines given or prescribed by the doctor contained arsenic, and the testimony excluded the administration of poison during the entire illness by any other person than the defendant. Two grains of arsenic is sufficient to produce

death, and the amount found in the body of the deceased would be certain to cause death.

Defendant stated at different times after his arrest that the arsenic in the fountain pen was tooth-powder, but after he was told that it would be examined he said that it was of no use,—that it was arsenic; that he intended to commit suicide when he was informed that he was charged with bigamy, but when he was charged with murder he concluded he would come back and face it. He said that he bought the arsenic and the fountain pen at a certain locality in New York City, but it was proved that fountain pens were not kept at the drug store at that locality and that no arsenic was sold to him at that place. All his statements with regard to his wealth, his employment with the Pullman Company or Armour & Co., his ownership of the cottage or the lot across the street, were false.

Witnesses who qualified as expert pathologists and chemists of long experience and high positions testified on the part of the People, in response to hypothetical questions presenting the symptoms of Mrs. Walcker Hoch during her illness and the existence of arsenic in her body after death, that she died from arsenical poisoning. Dr. Reese, who attended her during her illness, was a witness, and regarded all the symptoms as consistent with and pointing to his diagnosis of nephritis and cystitis, but conceded that his opinion had been formed with no knowledge or suspicion of the presence of arsenic, and his judgment was, that if the arsenic was administered while the patient was living, her death was due to arsenical poisoning. One witness testifying as an expert on the part of the defendant, said that, taking into consideration the symptoms and manifestations during the illness, and assuming that the arsenic was given to the deceased during her lifetime, a suspicion would be aroused in his mind that her death was due to the arsenic, but that at most he would have only a suspicion, which would not amount to an opinion. His opinion was that the presence

of the arsenic did not prove anything and the hypothesis of fact embraced in the question propounded to the experts did not warrant a conclusion as to the cause of death. He could not say of a certainty from the hypothesis of fact that the person did not die of sunstroke, shock due to uremic poisoning, diphtheria, scarlet fever, appendicitis, fright or tuberculosis, and he testified that the arsenic, including that which appeared as a white powder in the folds of the colon, might have been absorbed from the soil of the cemetery, in which other embalmed bodies had been buried. His testimony was contradictory of that given by the other experts, and it seems to have been discredited by the jury upon good grounds.

The first occurrence of the trial which is assigned as error is the ruling of the court that Amelia Fischer Hoch was a competent witness. She was sworn and an objection of the defendant to her competency was overruled and she testified in the case. The wife of a defendant is not a competent witness against him because of the importance to society of preserving the sanctity and harmony of the marriage relation. (*Hyman* v. *Harding,* 162 Ill. 357.) But a bigamous marriage being void, the woman is not a legal wife and is a competent witness against her supposed husband. Where parties enter into the marriage relation the legal presumption is in favor of the innocence of the parties and the validity of the marriage, and Amelia Fischer Hoch having been married to the defendant, she was *prima facie* his lawful wife and incompetent to testify, but when that presumption was overcome by proof that the marriage was bigamous she became competent. Where the relation of husband and wife has been assumed, the second wife can never be admitted as a witness to prove the first marriage, because that fact must be established before she can testify at all. Where she can be a witness at all she can testify to the second marriage and other facts not including the first marriage. (*Lowery* v. *People,* 172 Ill. 466; *Miles* v. *United States,* 103 U. S.

104; 30 Am. & Eng. Ency. of Law,—2d ed.—952; 5 Cyc. 699.) If there is an issue as to the fact of the first marriage or its validity, the second wife cannot be admitted as a witness until the fact of the first marriage is established by proof. If, however, the first marriage is admitted or is clearly proved, the alleged second wife is competent to testify, with the limitation before stated. (*Clark* v. *People,* 178 Ill. 37; 5 Cyc. 699; 4 Am. & Eng. Ency. of Law,— 2d ed.—47.) When a second wife is offered as a witness the question of her competency is for the court, and in deciding that question the court is not only the judge of the law, but also of the questions of fact necessary to be decided to determine the question. The court must act upon the evidence as presented at the time of the ruling, and if there is evidence of a first marriage and that the wife is still living and not divorced, the fact that the witness is not the wife of the party to the suit is established and she must be admitted to testify. There may also be a question of fact for the jury as to the existence or validity of the first marriage, and the determination of that issue must in such cases be left to the jury under proper instructions; but as the second wife can not testify to any fact tending to prove a first marriage, her testimony could have no influence in the decision of that question. If the wife is properly admitted to testify, all questions of fact as to either marriage must be left to the jury under instructions as to the law and with a supervisory power of the court over the verdict. In this case the marriage to Caroline Streicher was proved, and a witness who came from Philadelphia to the trial testified that she was still living; that he saw her just before he left Philadelphia, and that she and the defendant had not been divorced. The defendant had admitted that he had never been divorced, and the testimony of the witness was not contradicted or discredited in any manner.

It is insisted that the courts will often presume in favor of a second marriage, the death of a prior husband or wife

within a much less period than that under which such a pre-
sumption ordinarily arises, and that they will often presume
a divorce in order to sustain a second marriage,—and both
propositions are true. (*Cartwright* v. *McGown,* 121 Ill.
388; *Schmisseur* v. *Beatrie,* 147 id. 210.) There are many
presumptions which practically nullify each other, and under
particular circumstances the conflicting presumptions cease
to have any force. Where a first marriage is proved there
is a presumption in favor of its validity, but where a first
wife is living before a second marriage there is a presump-
tion of the continuance of life. The force and effect of such
presumptions are not well defined but depend in great meas-
ure upon the facts of a particular case, and in this case any
presumptions of the death of Caroline Streicher or of a di-
vorce were clearly overcome.

The court did not err in overruling the objection to the
competency of Amelia Fischer Hoch as a witness.

It is also contended that the provision of the constitution
that no person shall be compelled, in any criminal case, to
give evidence against himself was violated by introducing
evidence of defendant's statements. Most of the evidence
referred to was not objected to at the trial, and none of the
statements testified to were in the nature of admissions or
confessions of guilt. When the defendant was taken into
custody in New York he was taken to police headquarters,
where he was questioned by a police inspector, who stated to
him that he was going to ask him some questions; that he
need not answer them unless he wanted to, and that anything
he might say might be used against him at his trial. He
then gave his name as John Joseph Adolph Hoch, stated his
age and residence in Chicago, and said that he would answer
any questions put to him. He did not confess anything, but
said that he gave the name of Henry Bartells in New York
because he did not want his sister-in-law, with whom he had
some difficulty about some property in Chicago, to find out
where he was. A police officer offered him the fountain

pen, and he reached to take it, but drew back and said he had no pen. He was remanded for forty-eight hours, and going over to court on the morning of February 2 he was told about the white powder in the fountain pen and said it was tooth-powder. These are the material statements made in New York, and when proved on the trial no objection was made. On the train, coming from New York, a police officer told defendant that they would have the contents of the fountain pen analyzed to find out if it was tooth-powder, and the defendant then said it was no use analyzing it,—that it was arsenic. When he was brought to Chicago he was interrogated at the police station by an assistant State's attorney and others, and made statements that he had never been divorced, and told where he bought the arsenic and the fountain pen. He said that he got the arsenic for the purpose of committing suicide, and told the clerk from whom he bought it that he used it as medicine and was going to take a little bit. No objection was made to that evidence. There was a written statement which was objected to and the objection was overruled. It was made by the defendant to the police in Chicago, and in it he narrated some events of his life, such as when he came to America, and his movements, and his marriage with Mrs. Walcker, and her death. Neither in that statement nor any other did he make any confession but only offered explanations. He was cautioned in New York that anything he might say could be used against him, and he was at no time put in fear or offered any inducement to make any statement. There is no ground whatever for saying that the statements were obtained by any improper or unfair methods, and the constitutional right of the defendant was not violated in letter or spirit.

It is also argued that the court made improper remarks in the presence of the jury with regard to the testimony, which were prejudicial to the rights of the defendant. Upon the examination of Mr. Vail, from whom defendant rented the house, he was asked if the defendant said anything else

about his wife, and the attorney for defendant objected to leading the witness and apparently was commencing an argument on the subject, to the effect that if the witness was intelligent he could answer without being led, when the court said: "It does not make any difference whether he is intelligent or otherwise." The question was not leading and there was nothing prejudicial to the defendant in what was said, since it did not relate to any fact in the case and could not have influenced the jury. The next two instances of remarks by the court were merely correct statements of what a witness had said. Mrs. Knipple, testifying to the appearance of Mrs. Hoch, said that the color of her face was all gray and yellow,—all kinds of color. Counsel for defendant asked this question: "Well, I know, but what was the color of her face?" The court said: "She said all kinds of color." It was a correct statement of what the witness had said and was not an expression of opinion, but only a statement that the witness said it was all kinds of color. The next remark occurred on the examination of Bertha Sohn. Like a number of other witnesses she spoke German and was examined with the aid of an interpreter. She said that Mrs. Hoch was thirsty, but took a drink and vomited it, and complained of fearful gripping of the fingers. The next question put was, "Fearful what?" The interpreter in reply said: "Gripping, twitching, perhaps gripperlin." The court, who counsel say understood German, said to the interpreter in an interrogative way, "Sort of crawling sensation?" and the interpreter replied, "Crawling sensation." The witness further answered that she did not say it was painful, but it was as though her whole body was full of crawling ants. All that the court did was to aid in a more perfect translation of the answer, and the interpreter admitted the correctness of the translation by the court. There was no error in either case in correctly stating what the witness said. The next remark complained of was about a matter with which the jury had nothing to do. Amelia Fischer

Hoch was being examined with reference to the contents of a letter which she had testified had been destroyed. Counsel for the defendant was objecting, and said to the witness: "You have not yet made a search for the letter; you can find it." The court said: "It was destroyed, if I understand it correctly." Counsel said that she had not stated that she had made any search for it, and the court said: "It was destroyed." The witness said: "I said before, all the letters were destroyed except the ones which were produced." The court was not commenting on any fact to be submitted to the jury, but was passing on the admissibility of secondary evidence of the contents of the letter. The question of fact whether the letter had been destroyed was for the court, and it was entirely proper for him to state his conclusion on that subject. There was no error in any remark of the court.

Objection is made in argument to a hypothetical question propounded to the expert witnesses, on the ground that it was not a true statement of the symptoms of Mrs. Hoch and the facts in the case. It is said that it incorrectly assumed that a woman of previous uniform good health, who had for a long time been able to do washing and ironing and had never had any sickness except an occasional headache, was suddenly taken ill on December 20, that there was a suppression of urine and that she had no appetite. None of these objections are valid and the hypothetical question fairly stated the evidence. The only evidence was that Mrs. Hoch had been a healthy woman and had made her living by washing, house cleaning and similar work, and had saved money from her earnings. There was evidence that defendant had stated to the undertaker that she had died of kidney disease; that she had deceived him by saying that she was healthy, and he had found out that she had been doctored for that trouble by a doctor on the north side for many years. There was no evidence that any doctor on the north side had ever treated her and no evidence tending to prove

that the defendant's statement was true. There was evidence that she told her sister, Mrs. Sohn, that she had the retention or suppression referred to when Mrs. Sohn first came there, although subsequently the opposite condition undoubtedly existed. The hypothetical question covered both of those conditions. As to the question of appetite, there was evidence that she had no appetite but had a consuming thirst. She ate some of the squab and took soups and coffee and drank a great deal of milk and seltzer water, but retained scarcely anything on her stomach. Although the objections now made to the hypothetical question do not seem to have been made at the trial we find no objection to it.

It is assigned as error that the court refused to give instructions numbered 68, 70, 81 and 85 asked by the defendant. No. 85 was a peremptory instruction to find the defendant not guilty, and the foregoing statement of the evidence shows that it was properly denied. The other instructions related to the degree of proof required to warrant a conviction of a criminal offense upon circumstantial evidence alone. The rules of law contained in those instructions were the same that were given to the jury in instructions numbered 41, 51, 58 and 59, in which the same principles were repeated in varying forms and language. It was not error to refuse the instructions, which were substantially duplicates of those already given.

It is also contended that the evidence being circumstantial the guilt of the defendant was not established by that degree of proof which authorized a conviction. It is insisted that it was not proved beyond a reasonable doubt that Marie Walcker Hoch came to her death by the administration of arsenic through criminal agency, or, in other words, that the *corpus delicti* was not proved. The *corpus delicti* is made up of two essential elements: the fact of death, and the criminal agency of some person as the cause of death. (*Campbell* v. *People*, 159 Ill. 9.) The *corpus delicti* must be clearly established, (12 Cyc. 382,) but it may be proved by

circumstantial evidence. (*Campbell* v. *People, supra.*) The death of Marie Walcker Hoch was proved by direct evidence, and so, also, was the fact that sufficient quantities of arsenic were found in her body after death to produce death with absolute certainty if administered in her lifetime. The claim of the prosecution was that the arsenic was administered to her in some way or introduced by injections, and probably by both methods, and the fact that it was administered or introduced into the body during life is beyond any reasonable doubt. The proof excluded any theory of contamination of the body after death, and not only was arsenic found in the stomach and liver, but in the folds of the colon it was present in the powdered form, mingled with blood and mucous. The evidence was clear that the condition in the colon was the result of a vital process, or, in other words, that the arsenic was present during life. While nephritis and cystitis produce some of the symptoms manifested, the post-mortem examination showed that there was no such change in the vital organs as could have caused death, and the proof was that the symptoms were the usual ones in cases of arsenical poisoning. It was proved that a person suffering from arsenical poisoning might live as long as Mrs. Hoch did, and her symptoms at the last indicated the administration of a deadly dose at that time. The expert who testified for the defendant that the arsenic may have come from contamination through the soil of the cemetery and the intervening obstacles was contradicted, and in view of facts within the common knowledge his testimony did not raise a reasonable doubt of the criminal administration of the arsenic during life. It was even proved that the arsenic did not come from wall paper of the room where the deceased died, which was analyzed for the purpose of ascertaining the fact.

There cannot be any reasonable doubt that Marie Walcker Hoch came to her death from arsenic administered through the criminal agency of some person, and all the facts and circumstances pointed directly to the defendant as

the criminal agency. Among the facts which convinced the court and jury that he was the criminal agent were his numerous false statements and explanations; the evident absence of any conjugal affection, as shown by his conduct toward Mrs. Fischer and his proposal of marriage immediately upon the death of his wife; the possession of the arsenic; the motive of gain; the prospect of marrying Mrs. Fischer; his conduct and manner when he became aware of the charge of Mrs. Sohn against him, and all the facts and circumstances proved on the trial. By a system of exclusion it was proved that no other person administered the arsenic; that there was none in the medicines prescribed by the doctor or in the food or liquids prepared by any other person.

The court did not err in overruling the motion for a new trial.

The last point covered by the assignments of error is, that the judgment is insufficient because it fails to show an adjudication by the court that the defendant was guilty of the crime for which he was sentenced. After the court overruled the motion in arrest of judgment and an exception was taken to the ruling, the record is as follows: "And now neither the said defendant, nor his counsel for him, saying anything further why the judgment of the court should not now be pronounced against him on the verdict of guilty heretofore rendered to the indictment in this cause, therefore the sentence of this court is that you, the said Johann Hoch, otherwise called John Hoch, otherwise called Schmidt, be taken from the bar of this court to the common jail of Cook county, from whence you came, and there be safely and securely kept and confined until the 25th day of June, in the year of our Lord one thousand nine hundred and five, and on that day, between the hours of ten (10) o'clock in the forenoon and two (2) o'clock in the afternoon, you, the said Johann Hoch, otherwise called John Hoch, otherwise called Schmidt, be by the sheriff of Cook county, according

to the law, within the walls of said jail or in a yard or inclosure adjoining the same, be hanged by the neck until you are dead. And the sheriff of said Cook county is further instructed and commanded to carry into full effect and execution the judgment of this court in accordance with the laws of the State of Illinois; and may God have mercy on your soul." The argument is, that in order to make a valid judgment the record must show the *ideo consideratum est,* or, in other words, it must be considered by the court that the defendant is guilty of murder. If that position were correct, the proceedings would only be set aside back to the point where the error was committed and the cause would be remanded for a proper judgment on the verdict. (*Harris* v. *People,* 130 Ill. 457; *Wallace* v. *People,* 159 id. 446.) But we are of the opinion that the judgment was legal and valid. The whole record is to be considered, and if from the whole record it is apparent that the court found the defendant guilty of the crime and sentenced him to the punishment fixed by the law and the verdict, that is all that is required. It is necessary that the record should show that there was a sentence upon the verdict, but if it was necessary that the court approve the verdict, it was done by overruling the motion for a new trial. In the absence of a statute it is not necessary that the court should before sentence find as its independent judgment, upon the facts, that the accused is guilty. (12 Cyc. 778.) If the court states the finding of the jury and pronounces sentence thereon, that is a judicial determination of the fact of defendant's conviction and is all that is required. (*Davis* v. *Utah Territory,* 151 U. S. 262.) The verdict in this case determines the character of the crime and the penalty, and the sentence upon the verdict is an adjudication by the court and is sufficient as a judgment. *Murphy* v. *People,* 188 Ill. 144; *State* v. *Cook,* 92 Iowa, 484. .

We have considered every question presented by counsel for plaintiff in error, whether objection was made or excep-

tion saved upon the trial or not, and have disregarded any failure to object to any evidence or ruling or to except to any ruling.

There is no error in the record and the judgment is affirmed.

*Judgment affirmed.*