## THE HOXIE.

## AMERICAN EXPRESS CO. AKTIESELSKAB v. UNITED STATES.

(District Court D. Maryland. July 30, 1923.)

No. 970.

1. **Maritime liens** ⬥⟹28—**One making advances to charterer without inquiry not entitled to lien.**

One making advances to a charterer without inquiry as to ownership or charter is not entitled to a lien therefor under Act June 23, 1910, § 3 (Comp. St. § 7785), or ship Mortgage Act 1920, subsec. R., where, by the terms of the charter, the charterer was without authority to bind the vessel therefor, as could have been ascertained by reasonable diligence.

2. **Maritime liens** ⬥⟹2—**Rights of parties held governed by law of United States.**

Libelant, American Express Company Aktieselskab, is a Danish corporation organized and controlled by the American Express Company of New York, and like other European subsidiaries, operated as an agency of the latter. *Held*, in a suit to enforce a lien for advances made

to an American ship in Copenhagen, that the American company was the principal in the transaction and the real claimant, and that the rights of the parties were governed by the law of the United States and not by that of Denmark.

In Admiralty. Suit by the American Express Company Aktieselskab against the United States, owner of the steamship Hoxie. Decree for respondent.

Lord & Whip, of Baltimore, Md., for libelants.

Amos W. W. Woodcock, U. S. Atty., of Baltimore, Md.

SOPER, District Judge. The American Express Company Aktieselskab, a Danish corporation, basing its right to sue the United States upon the Act of March 9, 1920, c. 95 (41 Stat. 525), filed its libel in personam against the United States, owner of the steamship Hoxie, asserting a maritime lien on the steamship.

On April 19, 1920, the Georges Creek Steamship Company purchased the steamship from the United States Shipping Board for a specified sum, 10 per cent. to be paid in cash and the balance in semiannual installments of 5 per cent., under a contract subject to all other provisions of the bare-boat purchase charter plan, adopted or to be adopted by the Shipping Board. The provisions of the bare-boat purchase charter plan include the following:

"The charterer will not suffer nor permit to be continued any lien, incumbrance or charge which has or might have priority over the title and interest of the owner in said vessel."

On June 2, 1920, the vessel was delivered at the port of Baltimore to the Second National Steamship Company, and thereafter the United States had no connection with the management or operation of the vessel until she was retaken from the purchaser by the United States in December, 1920.

The Hoxie, in the control of its new owner, arrived in Copenhagen, Denmark, on or about August 18, 1920. The libelant, at the request of the Hoxie's owner or charterer, made certain advances to the Hoxie, enabling her to procure necessaries and materials, part of which were paid for by the Second National Steamship Company, leaving a balance unpaid of $4,479.95. The libelant having failed to collect the balance due either from the Georges Creek Steamship Company or the Second National Steamship Company, which were affiliated companies under a common management, brought this libel against the United States.

The libelant claims that under the law of Denmark, a maritime lien was imposed on the steamship by reason of the libelant's advances, and that the court in this case should apply the law of Denmark. Evidence of the law of Denmark was furnished by the depositions of learned advocates of the Supreme Court of Denmark, tending to support the libelant's contention. Under the law of Denmark, it appears that a suit of this kind must be brought within one year after the maritime lien attaches, but the libelant claims that this is a procedural matter not binding on this court, and that in any event negotiations between the libelant and the Shipping Board, prior to the institution of the

suit, were of such a character as to give the libelant every reason to believe that the claim would be paid without suit, and therefore the United States cannot equitably set up the defense of limitation.

The libelant further claims that the decision in The Clio-The Morganza Cases, hereinafter cited, is not applicable because under the Danish law the fact that a ship has been let to another party, to be used for his own account, does not prevent the person entitled to a maritime lien from attaching the ship.

. The United States defends the suit on a number of grounds. In the first place, it asserts that the American Express Company of New York, and not the Danish company of the same name, was the principal in this transaction, and that therefore the case is ruled by the decision of the Supreme Court in The Clio-The Morganza Cases. Other defenses are that the American Express Company of New York was the general agent of the charterer, and as such did not acquire a maritime lien for advances; that as the claim is for advances of money, and not for materials or supplies furnished the boat, the question of the validity of the lien is to be determined by American and not Danish law, and finally that if any lien attached, it expired before the libel was filed, because of the limitation of one year.

It is necessary to consider only one of the questions raised in the case, because it is conclusive of the whole matter. The ostensible libelant is the American Express Company Aktieselskab, which sues in this court claiming a lien upon the vessel for advances made in Denmark, and seeking the application of the Danish law rather than the law of the United States. If, as a matter of fact, the Danish company was merely the subsidiary or the agent of the American Express Company of New York, and if the real libelant is the last-mentioned company, the case should be determined in accordance with the law of the United States rather than the law of Denmark. If the law of the United States, laid down in The Clio-The Morganza Cases, is applicable, then the libel must be dismissed.

[1] The Act of 1910, c. 373 (36 Stat. 604 [Comp. St. § 7785]), recognizing liens on vessels for repairs, supplies, or other necessaries, contains the following provision:

"Nothing in this act shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor."

See, also, Act of June 5, 1920, c. 250, § 30, subsecs. P, Q, and R (41 Stat. 1005).

The application of this provision of the statute to a charter party containing the same limitation of liens cited above from the charter party in this case was decided in the cases of The Clio-The Morganza-The United States of America v. Amos D. Carver et al., 43 Sup. Ct. 181, 67 L. Ed. ——, decided by the Supreme Court of the United States January 2, 1923.

Justice Holmes said:

"If by investigation with reasonable diligence the materialman could have found out that the vessel was under charter, he was chargeable with notice

that there was a charter; if in the same way he could have found out its terms he was chargeable with notice of its terms."

[2] In the case cited, as in the case at bar, the libelant made no inquiry or effort to ascertain what the facts might be. If an inquiry had been made, the true situation and the interest of the United States in the vessel, and the superiority of its claim over any lien for supplies and advances would have readily been disclosed. The court will therefore determine as a matter of fact whether the real claimant in the case is the American Express Company of New York.

This concern is not a corporation, but an association or partnership. It owns 177 out of a total of 200 shares of the capital stock of the Danish corporation, the remaining shares being owned by officers and directors of the corporation. There were other American Express Companies in various European countries similar to the Danish company. In Paris there were located a Director General in Europe and a Vice Director General in Europe, who had general supervision over all the European companies. The headquarters were the offices of the American Express Company of New York in the city of New York. All of the companies formed a part of the American Express Company system owned and controlled by the American Express Company of New York.

The facts as to the ownership of the libelant company and its relation to the American Express Company of New York are brought out in the evidence in the answers of the Danish company to certain interrogatories filed with the answer of the United States. These facts were naturally in the peculiar possession of the libelant and the American Express Company of New York, which is conceded to be at least an affiliated concern, and it is safe therefore to draw conclusions from the facts so disclosed. Considerable correspondence between the American Express Company of New York and the Danish company, and between the American Express Company of New York and the purchaser of the Hoxie, relative to the claim in suit, was produced by the libelant. From this correspondence the relations of the two concerns are clearly established. In August, 1919, the American Express Company of New York sent out a circular letter of general instructions to the Danish corporation and to its other agencies in Europe, which were designated as agencies in the letter, calling attention to the fact that the United States Shipping Board had started to recommend the American Express Company as agents to handle some of their steamers in foreign ports. Each agency was instructed that in case a vessel was offered by the Shipping Board or by a steamship line, a fair estimate of expenditures was to be made and cabled to the general manager, through the ocean freight manager in New York. Collections were to be made by the express company of New York. The American Express Company of New York made an arrangement with the Georges Creek Steamship Company whereby it was agreed that they should cooperate together, and that the Georges Creek Steamship Company should use the foreign steamship agencies of the American Express Company of New York.

When the Hoxie arrived in Copenhagen on August 17, 1920, the Danish company, in accordance with the letter of instructions, cabled the New York company that the approximate amount of disbursements would be $8,000; on the next day it wired for instructions stating that the disbursements were approximately $12,000; subsequently additional expenditures were made, so that the total disbursements approximated $18,000. A part of these advances was made by the Danish company without prior authority from New York, and the New York company was unable to collect the entire amount from the Second National Steamship Company, so that the balance in suit remained unpaid. In November, 1920, the Vice Director General in Europe wrote to their manager in Christiania claiming that the Copenhagen office had not followed the instructions given in the circular letter of August 19th requiring prior notice before making disbursements, and asking the Christiania manager to secure an explanation from the Copenhagen manager. Such explanations were duly made. George L. Guthrie, the general agent of the steamship department of the American Express Company, speaks in his testimony of the libelant as the Danish company of the American Express. The evidence reveals an association with the American Express Company of New York in control, and divers foreign companies in Europe as subsidiary organizations in one great system. The conclusion from the undisputed evidence is inevitable that the Danish company was merely an agent or instrumentality of the New York company.

The libelant claims that the Danish corporation is an entity entirely separate and distinct from its stockholders, and should be recognized as such in this case. It cites the case of the Watertown Paper Co., 169 Fed. 252, 94 C. C. A. 528, where the court said:

"Unless, therefore, it can be shown that some exception to the general rule of separate corporate existence and liability applies in this case, it must follow that the claim of the pulp company should have been allowed. The only exceptions to that rule possibly applicable here are: (1) The legal fiction of distinct corporate existence will be disregarded, when necessary to circumvent fraud. (2) It may also be disregarded in a case where a corporation is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality or adjunct of another corporation."

Accepting this statement of the rule, the circumstances of the case at bar fall within it. The facts show that the Danish company was so organized and controlled, and its affairs were so conducted, as to make it merely an instrumentality or adjunct of the New York concern.

It is therefore unnecessary to consider the other defenses raised in the case. The libelant's claim is in truth the claim of the American Express Company of New York. Had the suit been brought in the name of that company, it must have failed for the reasons given in The Clio-The Morganza Cases. It cannot avoid the effect of those cases by causing suit to be brought in the name of its instrumentality, although incorporated as a separate corporation under the law of Denmark.

The libel will be dismissed.