**UNITED STATES v. LUTWAK.**

**UNITED STATES v. KNOLL.**

**UNITED STATES v. TREITLER.**

Nos. 10326–10328.

United States Court of Appeals
Seventh Circuit.

Jan. 3, 1952.
Rehearing Denied April 16, 1952.

Richard F. Watt, A. Bradley Eben and Bernard Weissbourd, all of Chicago, Ill., for appellant.

Otto Kerner, Jr., U. S. Atty., James B. Parsons, Asst. U. S. Atty., Chicago, Ill., Robert J. Downing, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before MAJOR, Chief Judge, DUFFY and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

Marcel Max Lutwak, Munio Knoll, alias Zygmunt Romankiewicz, and Regina Treitler were indicted jointly with Leopold Knoll, who was found not guilty, and Grace Klemtner, dismissed by the court, upon a count charging conspiracy to commit offenses against the United States, that is, to violate Sections 180a and 220(c),[1] Title 8 U.S.C.A., each of which forbid obtaining entry into the United States by a willfully false or misleading representation, statement or document required by the immigration laws; and to defraud the United States of its governmental functions and its right to administer its immigration laws, by effectuating the illegal entry of three aliens into the United States as spouses of United States citizens having honorable discharges from service in the Armed Forces of the United States during the Second World War, as provided by Section 232, Title 8 U.S.C.A. commonly known as the War Bride Act. Counts charging substantive offenses and aiding and abetting were dismissed for lack of proof of proper venue. Lutwak, Knoll and Treitler were found guilty and sentenced by the court and have perfected this appeal. We are concerned only with the charge of conspiracy and the proceedings thereunder.

In substance the conspiracy count charged that the parties conspired to have Marcel Lutwak, Bessie Osborne and Grace Klemtner, each of whom was an honorably discharged veteran of the Second World War, proceed to Paris, France, and there falsely pretend to marry respectively Maria Knoll, Munio Knoll and Leopold Knoll, all three of whom were of foreign nationality, and to bring them into this country as spouses of the veterans and thus to violate the immigration quota laws. It is readily apparent that an essential element of the crime charged lay in the averment that the three Parisian ceremonies were in fact not true marriages but spurious in character, for, if valid marriages came into being, the fact that the motives back of them were entries into this country would be wholly immaterial. Consequently, the contest in the trial court centered largely about these two factual questions, viz., did defendants conspire and, if so, did the government prove by competent evidence that the marriages were in fact invalid.

In so far as the issue of common purpose and design is concerned, we think it clear that the court properly overruled the motion for acquittal and submitted the issue to the jury. The evidence, in its aspects most favorable to the government, warranted a jury finding that the following are the facts. Regina Treitler, a sister of Munio Knoll and Leopold Knoll and an aunt of Marcel Lutwak, in 1947 was living in Chicago; her nephew Lutwak also lived in that city. The two male Knolls, brothers of Treitler and uncles of Lutwak, were in Paris. Maria Knoll was likewise in Paris. She had been married to Munio Knoll in 1932.[2] Mrs. Treitler, in the summer of 1947, inquired of a friend, Anne Zapler, whether the latter knew of veteran girls who would be willing to go to Europe to marry her brothers and bring them to the United States, telling her that they had been in concentration camps and were in a sorry plight. Mrs. Treitler said that "they" wanted someone who had been in

---

1. Included in 1948 Revised Criminal Code, 18 U.S.C.A. § 1546.

2. Whether she had been legally divorced from him is not determinable from the record.

service; that she would see that the girls' ways were paid; that the marriages need not be consummated, and that divorces could be obtained after six months. Lutwak also talked to Mrs. Zapler about the suggested action. Following these conversations, in September, Mrs. Zapler introduced Bessie Osborne to Lutwak as an ex-Wave, who, later the same month, told Mrs. Zapler that Osborne had consented to go and that "they" were happy about it. During the summer, in August, Lutwak went to Paris, there married his aunt, Maria Knoll, the undivorced or divorced wife of his uncle Munio, and brought her to America as a war bride, leaving her husband or former husband, his uncle, in Paris with his brother, Leopold Knoll, who had been present at this ceremony. Shortly later Lutwak told Mrs. Zapler that Bessie Osborne had consented to go to Paris. Mrs. Treitler also talked to Grace Klemtner, telling her that she, Treitler, was going to Paris, and proposed that Grace do likewise.

Lutwak told Osborne that his family wanted to bring his Uncle Leopold to the United States; that he was in search of a woman who had been in service to marry this uncle and bring him into this country; that he would pay $1000 and that within six months she could have a divorce. Treitler told her substantially the same. Lutwak also said to her that he had another uncle in Paris, Munio Knoll, who was married and whose wife was in America and that the family wanted to effectuate a reunion between the two. We bear in mind that shortly before that time, Lutwak had gone through a marriage ceremony with Maria, his aunt, whom, he told Osborne, he desired to reunite with her husband, his Uncle Munio, by bringing the latter to America. He then asked Osborne if she would marry Munio instead of Leopold. He agreed to pay her $500, and did pay for clothes she bought for the trip. What we have recounted is not a complete narration of all the facts and circumstances of record up to November 1, 1947, but will serve as a brief resume of the salient essentials.

Following the events related, Mrs. Treitler and Bessie Osborne went, on October 25, 1947, by airplane, to Paris, where, for the first time, Osborne met Munio Knoll. On November 3, she participated in a marriage ceremony with him. The two remained in Paris, living at different places, until November 12, 1947, when, after having ostensibly complied with the requirements of the War Bride Act, they left Paris by airplane for Chicago. Before they left, Treitler promised Osborne $1000. During her stay in Paris, Osborne attended the marriage ceremony of Grace Klemtner and Leopold Knoll, the latter of whom Lutwak had first suggested she marry. Upon her return to Chicago, Lutwak, in Munio's presence, gave her a check for $1000.

On November 1, 1947, one week after Treitler and Osborne left this country, Grace Klemtner followed them by air. She took with her her discharge from the army. There on November 2 or 3, she met, for the first time, Leopold Knoll. On November 6, she married him. While in Paris, she and Leopold lived at different hotels; and, very shortly, she proceeded, unaccompanied, to England for a short visit. She returned to New York in December, 1947. Leopold entered New York under the provisions of the War Bride Act, in early December 1947. The two did not live together. She proceeded immediately to California where she remained until she appeared before the grand jury in Chicago, about April 1, 1950. After that time, she testified, she lived with him.

■ From this evidence the jury was fully justified in finding that a concerted scheme was hatched in the summer of 1947 by the prime movers, Lutwak and Treitler, whereby they would obtain, by means of marriages with the three veterans, entry of their three relatives into this country; that this plan sprang from the brains of the two and was communicated to and joined by the girls and the aliens; that it culminated in the entries claimed to be illegal. Here was evidence of a common design, carried into execution by the interrelated, coordinated conduct of the several parties, who progres-

sively pursued the one object. In the face of this evidence, we can not say, as a matter of law, that there was more than one scheme, for it was sufficient to justify the jury in finding that there was one over-all common design and purpose. Thus, in Braverman v. United States, 317 U.S. 49, at page 54, 63 S.Ct. 99, at page 102, 87 L.Ed. 23, the court said: "The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for 'The conspiracy is the crime, and that is one, however diverse its objects'. Frohwerk v. United States, 249 U.S. 204, 210, 39 S.Ct. 249, 252, 63 L.Ed. 561; Ford v. United States, 273 U.S. 593, 602, 47 S.Ct. 531, 534, 71 L.Ed. 793; United States v. Manton, 2 Cir., 107 F.2d 834, 838. A conspiracy is not the commission of the crime which it contemplates, and neither violates nor 'arises under' the statute whose violation is its object. United States v. Rabinowich, supra, 238 U.S. [78], 87–89, 35 S.Ct. 682, 684, 685, 59 L.Ed. 1211; United States v. McElvain, 272 U.S. 633, 638, 47 S.Ct. 219, 220, 71 L.Ed. 451; see United States v. Hirsch, 100 U.S. 33, 34, 35, 25 L.Ed. 539. Since the single continuing agreement, which is the conspiracy here, thus embraces its criminal objects, it differs from successive acts which violate a single penal statute and from a single act which violates two statutes. See Blockburger v. United States, 284 U.S. 299, 301–304, 52 S. Ct. 180, 181, 182, 76 L.Ed. 306; Albrecht v. United States, 273 U.S. 1, 11, 12, 47 S. Ct. 250, 253, 254, 71 L.Ed. 505." See also Blumenthal v. United States, 332 U.S. 539, 558, 68 S.Ct. 248, 92 L.Ed. 154; Ford v. United States, 273 U.S. 593, 602, 47 S.Ct. 531, 71 L.Ed. 793; United States v. Rabinowich, 238 U.S. 78, 87–89, 35 S.Ct. 682, 59 L.Ed. 1211; United States v. Coplon, D.C.N.Y., 88 F.Supp. 912. The evidence relied upon by the government reflected substantial basis for the finding of the jury, which necessarily determined by its verdict that the defendants understood and knowingly participated in a coordinated scheme of conduct. Thus, as the Supreme Court said in American Tobacco Company v. United States, 328 U.S. 781, 809–810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575,

"Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified." See also United States v. Masonite Corporation, 316 U.S. 265, 275, 62 S.Ct. 1070, 86 L.Ed. 1461; United States v. Mack, 2 Cir., 112 F.2d 290, 292–293; United States v. Harrison, 3 Cir., 121 F.2d 930, 934; Allen v. United States, 7 Cir., 4 F.2d 688, 691.

However, before the jury could properly conclude that the scheme became an illegal conspiracy, it was necessary that the evidence be sufficient to justify a conclusion that the three marriages were void,—of no legal effect, and that they were so intended, for, if they were valid, the government cannot complain. In other words, whatever the motives of the participating parties in getting married, if they had bona fide intentions to enter into the marital relation, they had a perfect right to invoke the provisions of the War Bride Act in gaining access to this country. We are confronted, then, with the crucial question of whether the evidence justified a finding that the so-called marriages were void.

A sham marriage, void under the law of this country as against public policy, can have no validity. Lincoln v. Riley, 217 Ill.App. 571. In the language of the Second Circuit, in United States v. Rubenstein, 151 F.2d 915, 918, where the court cites many authorities: "Mutual consent is necessary to every contract; and no matter what forms or ceremonies the parties may go through indicating the contrary, they do not contract if they do not in fact assent, which may always be proved. * * * Marriage is no exception to this rule: a marriage in jest is not a marriage at all." The court proceeded: "if the spouses agree to a marriage only for the sake of representing it as such to the outside world and with the understanding that they will put an end to it as soon as it has served its purpose to deceive, they have never really agreed to be married at all. They must assent to enter into the relation as it is ordinarily understood, and it is not

ordinarily understood as merely a pretence, or cover, to deceive others." Furthermore a marriage void ab initio is void for all purposes and has no standing in court. McCullen v. McCullen, 162 App.Div. 599, 147 N.Y.S. 1069, 1071; Hooper v. McCaffery, 83 Ill.App. 341, 356–357; McClurg v. Terry, 21 N.J.Eq. 225.

Bearing in mind the principles enunciated, we examine briefly the evidence bearing upon this issue. The intent of the parties is largely reflected by what we have said as to their actions culminating in the entries into the United States. We have seen the design of Treitler and Lutwak to send veterans, including Lutwak himself, to Europe to marry their three relatives and bring them in as spouses of those veterans; we have observed their statements to the two women, Osborne and Klemtner, that they would be paid for their services, that the marriages need not be consummated, that they could obtain divorces within six months; that Lutwak proposed at first that one girl marry one uncle and later suggested that she marry the other one; that he suggested that one uncle, Munio, be brought to America to reunite with his wife, though shortly before, Lutwak, a veteran, had himself gone through a marriage ceremony with that wife and brought her from Europe as a war bride, and that the girls knew their proposed bridegrooms not at all. In addition, there was evidence that Maria, after entry as the purported bride of Lutwak, lived with her former husband Munio after he was brought in, though the latter had gone through a purported marriage with Osborne, and after she, Maria had herself, gone through a purported ceremony with Lutwak; that she was later divorced from Lutwak; that Osborne never lived with her purported husband, Munio Knoll; that about six months after their purported marriage, when she proposed divorce, he asked her to wait until he could be naturalized; that, finally, despite his request in November, 1950, she filed suit for divorce, which he requested her to delay until after the trial of this cause; that Klemtner, (called as a court witness), testified that she never received a wedding ring

from Leopold; that she and he lived separate and apart in Paris and in America, until she appeared as a witness before the grand jury in 1950, when, for some unexplained reason, she began to live with him. Many circumstances corroborating or cumulative to the foregoing appear in the record.

■ In the present case the court charged the jury fully and correctly as to the law, substantially in the words quoted from United States v. Rubenstein, supra, and advised the jurors that it was a question of fact for them to determine from the evidence whether at the times the aliens entered the United States the respective parties were in fact married and were entering as man and wife, and that, in determining that question, they should bear in mind the legal principles mentioned. By its verdict the jury has settled the question.

■ Defendants urge that the court erred in calling Grace Klemtner as a court witness and in permitting the government to cross-examine her. In the course of the trial, the United States Attorney said to the court that Grace Klemtner, who, it had been alleged had gone through a marriage ceremony with defendant Leopold Knoll and "is a person who could be considered as a witness" was present but that the government would not vouch for her truthfulness and veracity and did not desire to put her on the stand as its witness and asked whether the court felt it should call her. The court remarked that she had been a defendant whose constitutional rights he thought had been invaded and that he had accordingly discharged her, but that the evidence indicated that she was a witness to certain things in which the court was directly concerned and that, therefore, it should and would call her as its witness.

■ We see no error in this respect. Indeed, it is generally recognized that where there is a witness to a crime for whose veracity and integrity the prosecuting attorney is not willing to vouch, he is not compelled to call the witness, but that the court, in its discretion, may do so and allow cross-examination by both sides with-

in proper bounds. This rule was expounded at some length in the case of Litsinger v. United States, 7 Cir., 44 F.2d 45, and in Chalmette Petroleum Corp. v. Chalmette Oil Dist. Co., 5 Cir., 143 F.2d 826; what is said there is controlling here.

■ Defendants insist that the court unduly restricted their cross-examination of the witnesses Joseph Ludmer and Maria Knoll. In examining the latter, the government did not carry its direct examination beyond a showing of the fact that there had been an earlier marriage. Defendants sought on cross-examination to go beyond the scope of the direct examination and to go into the question of a sabbatical divorce between her and Munio, of the hotels most frequented in Paris by displaced persons, of how she arrived in Paris, of why her husband had changed his name and into other matters far beyond the scope of the direct examination. The court advised counsel that his questions were not within the scope of proper cross-examination but that if he wished to use the witness later as his own to prove the facts then sought to be elicited, he would have an opportunity to do so. To some of defendants' questions put to Ludmer the court sustained objections. Thus, one question was, "This is not the first time you have turned people into the authorities, is it?" At another point, he was asked whether he had discussed a certain letter from Mrs. Ludmer to Munio Knoll. He testified that he had no knowledge that the letter was sent, that he did not know it was going to be mailed and that, before it was sent, if it was sent, he had no conversation with his wife relative to sending it. What he and his wife may have said to each other, the court thought, was wholly immaterial. In another instance, the court refused to allow counsel for defendants to ask Ludmer where his wife could be found, in the event they chose to subpoena her as a witness. All the matters to which defendants refer were clearly beyond the scope of the direct examination. We conclude that the action of the court was within the principles approved by this court in United States v. Glasser, 7 Cir.,

116 F.2d 690, and United States v. Hornstein, 7 Cir., 176 F.2d 217.

We have examined defendants' objections to the charge to the jury and have read the charge in its entirety. It was thorough and complete, covering every phase of the case, impartially and freely. It demonstrated an earnest effort upon the part of the trial court to instruct the jury as to each possible defense suggested by the defendants. The language we have heretofore used in United States v. Fleenor, 7 Cir., 162 F.2d 935 and United States v. Kaadt, 7 Cir., 171 F.2d 600, is applicable.

■ Complaint is made that the court permitted evidence of events in America subsequent to the entries. When we remember that this case turned almost entirely upon the question of the validity of the Parisian marriages and that whether they were valid, in turn, depended upon the intent of the parties at the time the ceremonies occurred, it is clear that not only what was said and done prior to the time of the marriages, but that the conduct of the parties and their statements after they returned to America were relevant and competent for the jury to consider in determining whether in fact they reflected an intent to have performed valid marriages or whether they tended to show that the intent was merely to pretend to be married.

■ Defendants argue that this case illustrates a merger of a conspiracy with substantive offenses and that, therefore, a verdict of guilty of conspiracy can not be sustained. The rule that if two or more persons jointly commit a crime, they may not be convicted of a conspiracy to commit it, does not apply where parties other than the persons who commit the substantive offense have joined in a conspiracy to bring it about. Obviously, if more than one commit a crime there may be others engaged in a conspiracy to have it committed who do not themselves take part in its commission. So here Treitler was not a party to any one of the invalid marriages or to the false statements made thereafter to the immigration authorities, which constituted the essential events com-

prising the substantive offenses, but, under the government's evidence, she participated in, if she did not actually originate, the scheme to have the substantive offenses committed. Moreover the conspiracy contemplated not only a course of conduct culminating in one illegal marriage but three. Each ceremony was between different parties, yet the conspiracy contemplated that the several actors should commit the several substantive offenses. Hence, we conclude there was no merger of the offenses and that the rule expressed in Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 applies. "It has been long and consistently recognized by the Court that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses. The power of Congress to separate the two and to affix to each a different penalty is well established."

The judgment is affirmed.

### On Petition for Rehearing.

#### PER CURIAM.

The statements contained in the last three lines of the second paragraph of appellants' petition for rehearing, beginning with the words "In ignoring * * *" and the footnote 1 on the same page, together with the general tenor of the petition, might well justify striking the entire document for inexcusable impertinence and irrelevance. Clearly the matter mentioned in those two excerpts is in no way related to the facts or the law of this case. What the court may have done in matters involving other issues of fact and other principles of law, foreign to anything involved here, is no concern of appellants or their counsel. Presumably if the court has erred in some other case, counsel for the parties thereto will not fail to direct our attention to our miscomings.

However, rather than strike the petition, we prefer to indulge the belief that the matter, rather than being intentionally objectionable, was the result of the unrestrained ardor of a zealous advocate; instead of striking the petition, we direct the Clerk to delete therefrom the matter mentioned.

The petition for rehearing thus corrected really amounts to an unrestrained berating of the court for its failure to adopt defendants' theories advanced at the trial and in the argument in this court. It is in essence merely a reargument of everything previously presented. However, the argument that the alleged wives were incompetent is renewed with such vigor and is of such importance in the law of evidence that we have thought it advisable to enlarge upon what we said with respect to this issue. Accordingly the paragraph on page 8 of our opinion beginning "Defendants assert error * * *" and the paragraph following are stricken from the opinion and substituted therefor as a supplement to our decision is the following.

Maria Knoll or Romankiewicz or Lutwak, originally married to Munio Knoll, and later, ostensibly, to Lutwak, testified for the government. Munio interposed no objection to her competency. Lutwak objected to her testimony as to what occurred after the second alleged marriage, i.e. that to him, Lutwak, in August 1947. Grace Klemtner, allegedly married to Leopold, also testified. Leopold preserved an objection, but, inasmuch as he was acquitted, the question as to her privilege or competency as against him has become moot. She was unquestionably competent as to all other parties. Bess Osborne, who went through a marriage ceremony with Munio Knoll in Paris, was the other alleged spouse called to testify for the government. Munio objected upon the ground that she was his wife, though the record showed that he had previously married Maria. Other parties not related to her objected on the same ground. However, the privilege of the alleged husband does not extend to others.

Our real question then is: Did the court properly admit the testimony of Maria against Lutwak, and the testimony of Bess against Munio? There is no statute or Supreme Court decision declaring this testimony privileged or incompetent. Its legal status can best be understood from a

somewhat detailed examination of authoritative decisions.

In Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 213, 78 L.Ed. 369, the Supreme Court after reviewing certain earlier cases, held the wife of the defendant on trial for a criminal offense to be a competent witness in his behalf. Whether she could properly have been called to testify against him was not presented or decided. In the course of its decision, the court quoted from Benson v. United States, 146 U.S. 325, 13 S.Ct. 60, 36 L.Ed. 991: "the theory of the common law was to admit to the witness stand only those presumably honest, appreciating the sanctity of an oath, unaffected as a party by the result, and free from any of the temptations of interest. * * * today the tendency is to enlarge the domain of competency, and to submit to the jury for their consideration as to the credibility of the witness those matters which heretofore were ruled sufficient to justify his exclusion. This change has been wrought partially by legislation and partially by judicial construction. * * * steadily, one by one, the merely technical barriers which excluded witnesses from the stand have been removed, till now it is generally * * * true that no one is excluded therefrom unless the lips of the originally adverse party are closed by death, or unless some one of those peculiarly confidential relations, like that of husband and wife, forbids the breaking of silence."

The court also quoted from Rosen v. United States, 245 U.S. 467, 38 S.Ct. 148, 62 L.Ed. 406, as follows: "In the * * * which have elapsed since the decision of the Benson Case, the disposition of courts and of legislative bodies to remove disabilities from witnesses has continued, as that decision shows it had been going forward before, under dominance of the conviction of our time that the truth is more likely to be arrived at by hearing the testimony of all persons of competent understanding who may seem to have knowledge of the facts involved in a case, leaving the credit and weight of such testimony to be determined by the jury or by the court, rather than by rejecting witnesses as incompetent * * *.

Satisfied as we are that the legislation and the very great weight of judicial authority which have developed in support of this modern rule, * * * proceed upon sound principle, we conclude that the dead hand of the common-law rule of 1789 should no longer be applied to such cases as we have here".

The Supreme Court continued: "The rules of the common law which disqualified as witnesses persons having an interest long since in the main have been abolished both in England and in this country; and what was once regarded as a sufficient ground for excluding the testimony of such persons altogether has come to be uniformly and more sensibly regarded as affecting the credit of the witness only. * * * Nor can the exclusion of the wife's testimony, in the face of the broad and liberal extension of the rules in respect of the competency of witnesses generally, be any longer justified, if it ever was justified, on any ground of public policy. It has been said that to admit such testimony is against public policy because it would endanger the harmony and confidence of marital relations, and, moreover, would subject the witness to the temptation to commit perjury. Modern legislation, in making either spouse competent to testify in behalf of the other in criminal cases, has definitely rejected these notions, and in the light of such legislation and of modern thought they seem to be altogether fanciful. The public policy of one generation may not, under changed conditions, be the public policy of another. Patton v. United States, 281 U.S. 276, 306, 50 S.Ct. 253, 74 L.Ed. 854.

"The fundamental basis upon which all rules of evidence must rest—if they are to rest upon reason—is their adaptation to the successful development of the truth. And since experience is of all teachers the most dependable, and since experience also is a continuous process, it follows that a rule of evidence at one time thought necessary to the ascertainment of truth should yield to the experience of a succeeding generation whenever that experience has clearly demonstrated the fallacy or unwisdom of the old rule.

"It may be said that the court should continue to enforce the old rule, however contrary to modern experience and thought, and however opposed, in principle, to the general current of legislation and of judicial opinion it may have become, leaving to Congress the responsibility of changing it. Of course, Congress has that power; but, if Congress fail to act, as it has failed in respect of the matter now under review, and the court be called upon to decide the question, is it not the duty of the court, if it possess the power, to decide it in accordance with present-day standards of wisdom and justice rather than in accordance with some outworn and antiquated rule of the past? That this court has the power to do so is necessarily implicit in the opinions delivered in deciding the Benson and Rosen Cases. * * * The rule of the common law which denies the competency of one spouse to testify in behalf of the other in a criminal prosecution has not been modified by congressional legislation * * *. That this court and the other federal courts, in this situation and by right of their own powers, may decline to enforce the ancient rule of the common law under conditions as they now exist, we think is not fairly open to doubt."

Following this decision, Rule 26 of the Federal Rules of Criminal Procedure was adopted, 18 U.S.C. providing that "The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." It is clear that the language of the rule sprang from the decisions of the Supreme Court in the Funk case and in Wolfle v. U. S., 291 U.S. 7, 12, 54 S.Ct. 279, 78 L. Ed. 617.

In 1935 there arose before the Court of Appeals for the 10th Circuit the question of the admissibility of the testimony of a wife against her husband in a criminal prosecution of the latter. The court said: "From the dawn of the common law until the middle of the nineteenth century, the accused could not testify in his own behalf because of his interest in the event of the trial. * * * The accused is now a competent witness in his own behalf in every state save possibly one.

"By similar statutes every state but one permits a wife or husband to testify when the other is accused, sometimes only in his behalf or with his or her consent. * * * Congress passed no statute removing the bar as to her, but as has been seen the ancient rule was abrogated by judicial decision. A wife is now competent to testify for her accused husband; the question still remains, May she testify against him? In this case, she was divorced when she testified, and there may well be a distinction on that ground. We prefer, however, to rest our decision on the underlying question, whether a wife is incompetent as a witness when called by the prosecution.

"The accused himself, by the federal constitution and the constitution or laws of the states, may not be compelled to testify upon his own trial. Should that immunity extend to his wife? The enlightenment of the times which requires modification of common law principles may be found in the informed judgment of legislatures or the courts. Funk v. United States, supra. * * *

"These statutes, and the decisions of many courts which might be cited, indicate a clear and decided trend toward removing the bar of incompetency from witnesses as such; that we are moving steadily in the direction of allowing the trier of the facts to hear all the evidence, the interest or relationship of the witness to the parties being given due consideration in weighing its value. The trend is in the right direction". Yoder v. United States, 80 F.2d 665, 667.

In United States v. Walker, 2 Cir., 176 F. 2d 564, 568, certiorari denied 338 U.S. 891, 70 S.Ct. 239, 94 L.Ed. 547, Judge Learned Hand, writing for the majority, said: "In Yoder v. United States the Tenth Circuit declared that, like her incompetence to testify in her husband's behalf, a wife's incompetence to testify against him had become obsolete and should be abolished * * *. A few months later the Third Circuit held the contrary of this dictum, and the Sixth

Circuit made the same ruling only a year ago. Thus, the question is still open in point of authority." He proceeded: "It is always a debatable question how far any relevant evidence should be privileged. It deprives the party against whom the privilege is invoked of access to the truth; and a disclosure of the whole truth should be the prime concern of a court of justice. Whether in a given situation the interest of the privileged party in suppressing the truth, ought to outweigh that concern would seem to be a matter for Congress, and not for the courts. * * * We conclude therefore that we should await the choice of Congress between the conflicting interests involved, or such an overwhelming general acceptance by the states of abolition of the privilege, as induced the Supreme Court to action in Funk v. United States, supra."

Judge Clark, dissented, saying: "Admittedly the common-law principle that 'a wife cannot be produced either for or against her husband, * * *' is gone; indeed, there is none now so poor as to do it reverence. But I think we tend to overlook the fact that our duty to interpret 'the principles of the common law' in the light of 'reason and experience,' Federal Rules of Criminal Procedure, rule 26, compels us to discover anew a rational rule, and that a rule looking at least halfway toward the past is itself a new embodiment of the law without, however, the gain of being a real adjustment to modern life. In this instance, therefore, I prefer the forthright approach of a great American judge, McDermott, J., speaking for a unanimous court in Yoder v. United States, 10 Cir., 80 F.2d 665, and placing his decision by preference on this very point. * * *

"I think that the judge's ruling below, made after careful hearing and argument, faced modern realities in the spirit invoked in Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369, 93 A.L.R. 1136, and now embodied as a mandate in F.R.Cr.P. 26." He added this footnote: "Approved by those courts of last resort, the law reviews: 24 Calif.L.Rev. 472; 4 Duke B.A.J. 107; 35 Mich.L.Rev. 329; 20 Minn.L.Rev. 693; 10 So.Calif.L.Rev. 94. See also Hutchins & Slesinger, Some Reflections on the Law of Evidence; Family Relations, 13 Minn.L.Rev. 675."

In Shores v. United States, 8 Cir., 174 F.2d 838, 840, concerning various decisions, the court said: "All these accordant decisions were precedent of the emancipating declaration made by the Supreme Court in 1933, in Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 363, 93 A.L.R. 1136, that the federal courts were not to regard themselves as being fettered by the limitations of the criminal evidence rules of the common law as they might have existed at some particular time; that in the initial adoption of common law rules for the federal judicial system there equally was intended to be an adoption of those principles of extension and growth which always had been regarded as being inherent in the common law system and which in fact constituted the genius of that system; * * * that the courts at all times, in the application of any rule of evidence, should give heed to the general currents of legal thought, judicial opinion, and legislative action in the particular field; and that they should continuously 'declare and effectuate, upon common-law principles, what is the present rule upon a given subject in the light of fundamentally altered conditions' and on the basis of 'present day standards of wisdom and justice.' 290 U.S. at pages 383 and 384, 54 S.Ct. at page 216, 78 L.Ed. 363, 93 A.L.R. 1136.

"Mr. Justice (later Chief Justice) Stone restated the doctrine of the Funk case, in Wolfle v. United States, 291 U.S. 7, 12, 54 S.Ct. 279, 78 L.Ed. 617, decided at the same term, in the terse language, that rules of criminal evidence should be 'governed by common-law principles as interpreted and applied by the federal courts in the light of reason and experience.' This language was incorporated into Rule 26 of the subsequently promulgated Federal Rules of Criminal Procedure, 18 U.S.C.A. * * * The Notes of the Advisory Committee added the following comment: 'This rule contemplates the development of a uniform body of rules of evidence to be applicable in trials of criminal cases in Federal courts. * * * The rule does not fetter the applicable law of evidence to that originally

existed at common law. It is contemplated that the law may be modified and adjusted from time to time by judicial decisions.'

"Since the liberating mandate of the Funk case, all the decisions in which the question here involved has arisen have held that, under present-day concept of the common law exception to the incompetency of a wife's testimony against her husband, his transportation of her in interstate commerce for the purpose of having her engage in prostitution is such a personal wrong against her as to make her testimony admissible in a prosecution of him under the Mann Act. See United States v. Mitchell, 2 Cir., 137 F.2d 1006, reaffirmed 138 F.2d 831, certiorari denied 321 U.S. 794, 64 S.Ct. 785, 88 L.Ed. 108, rehearing denied 322 U.S. 768, 64 S.Ct. 1052, 88 L.Ed. 1594; United States v. Williams, D.C.Minn., 55 F.Supp. 375; Levine v. United States, 5 Cir., 163 F.2d 992; Hayes v. United States, 10 Cir., 168 F.2d 996, Cf. also Wilhoit v. Hiatt, D.C.Pa., 60 F.Supp. 664.

"Yoder v. United States, 10 Cir., 80 F.2d 665, undertook to go even further and to declare generally that a wife's testimony may be received against her husband in a criminal case of any nature, subject only to the incompetency of any communications made within the field of marital privilege, where that privilege is asserted. Thouvenell v. Zerbst, 10 Cir., 83 F.2d 1003, approved and repeated this broad view. * * * The American Law Institute's Model Code of Evidence, however, like the Yoder case, permits a privilege to be claimed against a wife's testimony only as to confidential communications of the marital relationship. * * * The right under the common law rule, of an accused not to have his spouse testify against him, and the equal right of such spouse to refuse to do so were privileges created by and having their existence only within the scope of the rule itself. * * * The public policy involved, under which it was deemed of more importance to leave the wife's testimony available in the class of offenses encompassed by the exception, than to cloak it with the privilege of the rule, necessarily had as its underlying basis the interest of society generally, and not simply that of the wife individually, * * *."

In United States v. Graham, D.C., 87 F. Supp. 237, defendant was indicted for having transported into the state $5000 in money theretofore stolen or taken feloniously by fraud in violation of Section 415 now 2314 Title 18 U.S.C. In prosecuting him, the government called his wife to testify, that the money had been stolen from her. The defendant urged that she was incompetent. The court, after thorough examination of the historical background of the common law and the statutory law affecting women and women's rights and their position as witnesses, made various pertinent comments. Thus it said 87 F.Supp. at page 239: "The adoption of the Federal Rules of Criminal Procedure marked an important step in a lengthy struggle to improve the administration of criminal justice through judicial rule making. * * * By statute many of the states have gradually abolished restrictions as to the competency of spouses to testify against each other. See Wigmore on Evidence, 3rd Ed., Sec. 488. Many of these statutes are lacking in uniformity and it is difficult to state any general rule with respect to them. * * *

"It is agreed by some legal writers that the rule prohibiting husband and wife from testifying against each other has long outlived its usefulness and that in the interests of justice, the court should be permitted to hear all of the evidence. Wigmore states it thus: 'This privilege has no longer any good reason for retention. In an age which has so far rationalized, depolarized and de-chivalrized the marital relation and the spirit of Femininity as to be willing to enact complete legal and political equality and independence of men and women, this marital privilege is the merest anachronism, in legal theory, and an indefensible obstruction to truth, in practice.' 3rd Ed., Vol. 8, Sec. 2228, p. 232."

We have quoted at length from the decisions, in the hope of demonstrating that in a case such as this, the rules of evidence, as defined in Rule 26, have shown an increasing tendency toward abolishment of

incompetency in favor of admissibility, leaving the interest of the witness to the trier of the facts as bearing upon credibility. In other words, under the modern trend of thought in this country, the spouse, instead of being incompetent, is to be admitted as an interested witness, whose credibility is for the jury. This conclusion, we think, is the only one consistent with the reasoning of the Supreme Court in the decisions quoted and that of other courts. We conclude that, in view of the fact that Rule 26 of the Federal Rules of Criminal Procedure provides that the admissibility of evidence and the competence and privileges of witnesses shall be governed, in the absence of an act of Congress, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience, and in view of the reasoning of the Supreme Court and other courts, we are justified in holding that, irrespective of all other questions, the wives were competent witnesses.

■ If we be wrong in this conclusion, then we think that, for another reason, the condition of the record here was such that the court was justified in permitting them to testify. A substantial part of the government's case had been submitted before any question of competency arose. The court obviously believed that a prima facie case of invalidity of the marriages had been presented. In such a situation it seems to us only reasonable that the court should conclude, that, in view of the prima facie case of invalidity, the jury should hear what the wives had to say and make the final determination of fact. This rule we think is in accord with authoritative decisions.

Thus in Hoch v. People of the State of Illinois, 219 Ill. 265, 76 N.E. 356, the court held: In determining the competency of an alleged wife as a witness the court must act upon the evidence as presented at the time of the ruling, and if there is evidence establishing a former marriage of the accused and that the first wife is still living and undivorced it is not error to permit the wife of the bigamous marriage to testify, but all questions of fact as to either marriage must be left to the ultimate determination of the jury, under proper instructions. In Clark, alias French v. People, 178 Ill. 37 at 38, 52 N.E. 857, the court held that: The law is that where parties enter into a marriage contract and one of them has at the time a living spouse from whom he or she has not been legally divorced, the marriage is, as to the other, absolutely void. (Cartwright v. McGown, 121 Ill. 388, 12 N.E. 737.) Where the supposed marriage is void the alleged husband and wife are competent witnesses for or against each other, even though they believe themselves to be lawfully married. The admission of evidence should as far as possible lie in the discretion of the trial judge. Klein v. United States, 8 Cir., 176 F.2d 184, cert. denied 338 U.S. 870, 70 S.Ct. 145, 94 L.Ed. 533; United States v. Riccardi, 3 Cir., 174 F.2d 883, cert. denied 337 U.S. 941, 69 S.Ct. 1519, 93 L.Ed. 1746; United States v. Gottfried, 2 Cir., 165 F.2d 360, cert. denied 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139; Oliver v. U. S., 4 Cir., 267 F. 544.

■ It is difficult to follow defendants' reasoning as to alleged validity of the marriages under French law. Under Illinois law, and quite generally in this country, a sham marriage, one in jest, or one intended to be only a pretense is void. In the absence of proof to the contrary, the marriage laws of another state or country are presumed to be the same as the laws obtaining in the forum; there is no presumption that the marriage laws of another state or country are different from the laws obtaining in the forum. Lincoln v. Riley, 217 Ill.App. 571; Finer v. Steuer, 255 Mass. 611, 152 N.E. 220; Juilliard & Co. v. May, 130 Ill. 87 at 97, 22 N.E. 477; Nehring v. Nehring, 164 Ill.App. 527 at 530. Thus it was held that the laws of the Argentine Republic relating to the purchase of a draft are presumably in accord with the law merchant as recognized in New York. Scura v. National City Bank of New York, 107 Misc. 93, 177 N.Y.S. 75. There is no presumption that the law of foreign countries is unlike ours. The Fort Gaines, D.C.Md., 18 F.2d 413, 414; The Hoxie, 4 Cir., 297 F. 189, 190, affirming D.C., 291 F. 599, certiorari denied; American Exp. Co. v. U. S., 45 S.Ct. 91, 266 U.S. 608, 69 L.Ed. 465;

Royal League v. Kavanagh, 233 Ill. 175, 84 N.E. 178.

 If the French law differs from that of Illinois and the United States, it was defendants' duty to show that fact and thus rebut the presumption that it was the same. In Peirce, Admr. v. Peirce, 379 Ill. 185 at 191, 39 N.E.2d 990, 993, the court said: "The general rule of conflict of laws is that the marital status is governed by the law of the State of domicile. Loughran v. Loughran, 292 U.S. 216, 54 S.Ct. 684, 78 L.Ed. 1219; People v. Shaw, 259 Ill. 544, 102 N.E. 1031, L.R.A.1915E, 87; 35 Am.Jr. (Marriage) 286, par. 170." In the absence of rebuttal evidence to the contrary then, the marriages were void under the French law.

The petition for rehearing is denied.