(No. 57069.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appel-
lee, v. CHARLES M. ALBANESE, Appellant.

*Opinion filed February 22, 1984.—Rehearing
denied June 4, 1984.*

SIMON, J., concurring in part and dissenting in part.

Charles M. Schiedel and Carroll J. King, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Theodore J. Floro, State's Attorney, of Woodstock (Gail A. Moreland, Assistant State's Attorney, of counsel, and Laura Gitlin and Leslie Schermerhorn-Stahlecker, law students), for the People.

JUSTICE CLARK delivered the opinion of the court:

Defendant, Charles Albanese, was arrested in November of 1981, and a McHenry County grand jury returned a four-count indictment charging him with the murder of his father and his wife's grandmother by arsenic poisoning, the attempted murder of his brother, and the offense of theft from Allied Die Casting Corporation. The defendant was also indicted in Lake County for the murder of his mother-in-law, but that separate charge is not the subject of this appeal. In January of 1982, the Mc-

Henry County grand jury issued an amended indictment which added a further count of theft. The defendant requested and obtained a change of venue to McLean County, where a jury found him guilty in May of 1982 and sentenced him to death. A direct appeal was taken to this court (Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603).

In 1980, Charles Albanese was president of Allied Die Casting Corporation, a family business that manufactured trophies and loving cups. Albanese was married and lived in a large home in Spring Grove with his third wife and two daughters. Albanese had three other daughters by his first wife, and they were living in Wisconsin with their mother. Albanese maintained what can be termed a comfortable life style; he had a swimming pool, two Cadillacs leased by Allied Die Casting Corporation for the family's use, and he took frequent vacations to tropical destinations. Albanese testified that he spent everything that he earned and was not able to live on $110,000 per year "and do some of the things I want."

Charles Albanese began experiencing serious economic problems in July of 1980. He was behind in his mortgage payment and six months' delinquent in child-support payments to his first wife. He also owed a $15,000 note at the State Bank of Richmond, due on August 14, 1980. In July of 1980, his ex-wife's lawyer filed a petition requiring him to appear in court on a rule to show cause, and a body attachment was issued when he failed to appear.

On August 3, 1980, Marion Mueller, defendant's mother-in-law, and Mary Lambert, Mrs. Albanese's grandmother, came to the Albanese home for Sunday dinner. Mueller and Lambert lived together in a condominium at Leisure Village, a retirement complex in Fox Lake, and often visited the Albanese home for Sunday dinner. The family ate Polish sausage and sauerkraut

family style from the same platter, so it appears the arsenic was ingested from another source. Charles Albanese testified that, to his knowledge, the two guests had nothing to drink. Charles Albanese insisted this was the case even though the 87-year-old Mary Lambert was working in the yard on a hot day for several hours prior to eating dinner.

On August 4, 1980, Charles Albanese sent his ex-wife's lawyer a postdated check for $3,648, the amount of the child-support arrearages, along with a note that informed the attorney that the check was dated August 15 because a deposit would be made to his account around August 13. Charles also sent him a postdated check for $500. On August 5, 1980, Mary Lambert was admitted to the emergency room at McHenry Hospital with a history of vomiting and diarrhea for the preceding 36 to 48 hours. On August 6, 1980, Mrs. Lambert died leaving Marion Mueller and Virginia Albanese as her heirs. Charles Albanese's wife, Virginia Albanese, closed out her grandmother's checking account and transferred $3,600 to the joint-tenancy checking account she shared with her husband. This amount helped to cover the postdated check for Charles Albanese's child-support payments.

Charles Albanese was arrested for his child-support arrearage on August 8, 1980, while on the way to Mary Lambert's funeral. He was released when it was made clear that he would pay the delinquent child support. Marion Mueller experienced vomiting and diarrhea shortly after the August 3, 1980, meal at the Albanese home, and she was hospitalized at St. Therese's Hospital in Waukegan on August 16, 1980. Her condition deteriorated and she died on August 18, 1980. On August 20, 1980, money held in a joint-tenancy account with Virginia Albanese and Marion Mueller was transferred to the joint-tenancy account of Charles Albanese and Vir-

ginia Albanese.

The body of Marion Mueller was exhumed on August 31, 1981, and the body of Mary Lambert was exhumed on August 13, 1981. The official cause of death for both women was acute gastroenteritis due to arsenic poisoning. Mary Lambert had approximately eight times the normal amount of arsenic in her body and Marion Mueller had five times the normal concentration of arsenic. Forensic chemist Joerg Pirl testified that the two women died of a massive dose of arsenic.

Virginia Albanese received $6,000 in life insurance proceeds and pension fund proceeds from Marion Mueller's death, and the money was used to make the delinquent payments on the Albaneses' mortgage. The State Bank of Richmond granted Charles Albanese two extensions on the note due August 14, 1980, because Charles Albanese told the bank that he had some real estate that he was trying to sell. Charles and Virginia Albanese sold the Leisure Village condominium owned by the two dead women for $50,000 in October of 1980. Virginia Albanese inherited the condominium by intestate succession. Twenty thousand dollars from this sale was deposited in the joint account of Charles and Virginia Albanese, and this amount was used to satisfy the $15,000 note due at the Richmond State Bank.

In 1980, Allied Die Casting was owned by three stockholders: Charles Albanese, M. J. Albanese (Charles' father), and Michael Albanese (Charles' brother). The three men made up the board of directors and each held an executive office. Charles Albanese was president of the corporation, Michael Albanese was vice-president, and M. J. Albanese held the office of secretary-treasurer. The shareholder agreement, approved by the board of directors, gave special powers to M. J. Albanese. He had absolute power to control and manage the company, including the power to veto or negate the decision of any

other officer or employee. This arrangement was consistent with the origins of Allied Die Casting. M. J. Albanese was the moving force behind the business, and Charles had joined the family business when a previous job had not worked out. Charles Albanese did not have a good relationship with his brother, Michael Albanese, but conflicting testimony was offered concerning the relationship between Charles Albanese and M. J. Albanese.

A. Donald Fishbein, attorney for Allied Die Casting, testified that he attended a corporate meeting on September 4, 1980. Fishbein, Michael Albanese, Charles Albanese, M. J. Albanese, and M.J.'s wife, Clara Albanese, were in attendance. Fishbein testified that the purpose of the meeting was to terminate the employment of Charles Albanese. Charles Albanese disputed this claim when he testified in his own behalf at trial. After the meeting, the board of directors executed an amendment to the shareholder's agreement that caused the demotion of Charles Albanese. M. J. Albanese was made president, Michael Albanese was made secretary and vice-president, and Charles Albanese was made treasurer. Clara Albanese was to become a stockholder, having equal ownership with the three men.

On September 8, 1980, Michael Albanese ate his lunch at work. He had left his sandwich in his office prior to lunch. Michael began vomiting about an hour after eating lunch, and was hospitalized later that day. He left the hospital on September 13, 1980. On November 14, 1980, Michael Albanese experienced another attack of vomiting and diarrhea about two hours after eating lunch at work, and again sought medical attention. He was not hospitalized, but was placed on a bland diet in order to alleviate the symptoms of an ulcer that was detected by the treating physician, Dr. Miller. Michael Albanese's wife began preparing lunches for Michael to take to work in order to conform with the bland diet

recommended by Dr. Miller. Michael testified that his periods of illness usually began after he had eaten or had coffee at work.

On February 21, 1981, Michael Albanese's wife heated a can of pea soup and placed it in a thermos for her husband to take to work. Michael Albanese left the thermos in his office when he left to keep an appointment with Dr. Miller. He returned around lunch time after Dr. Miller had told him that his ulcer was under control and that he could discontinue the bland diet. Michael began eating his soup while M. J. Albanese was talking to him. Charles Albanese urged his father to leave Michael alone until he had finished eating. Michael testified that he only ate about half of the soup because it "tasted funny." He went into the computer room and began working. After a short time, he began vomiting and became so ill that he left the office. He had to stop his car on the side of the road in order to vomit before he reached home. He went to bed but was plagued by vomiting and diarrhea until the next morning, when he called Dr. Miller. Outpatient tests were performed that day, and Dr. Miller ordered immediate hospitalization.

Although Michael was discharged from the hospital on March 13, 1981, his condition was still very serious. In addition to the gastrointestinal difficulties, Michael began experiencing numbness in his hands and feet, and the nerve damage became so severe he was unable to walk, dress himself, or carry on normal business activities. He was in intense pain and had difficulty sleeping at night. His wife had rinsed out the thermos, but police tests revealed the presence of arsenic in the thermos.

Medical tests revealed that Michael Albanese was not suffering from an ulcer, but that he had received sublethal doses of arsenic over a period of several months, and that this poisoning was the cause of his nerve damage. Michael's condition improved slowly, and he was fi-

nally able to return to work and walk with the aid of leg braces. At the time of trial, in May 1982, he still had difficulty with his hands, and the residual numbness was so severe he was unable to perform many simple tasks such as buttoning his shirt.

M. J. Albanese kept a cookie jar in his credenza at work, and often ate cookies while he worked at his desk. In March of 1981, M.J. began vomiting and experiencing severe diarrhea. The symptoms were so similar to Michael's that Dr. Miller suspected that M.J. was having psychological problems caused by the serious illness of his son. On April 21, 1981, M. J. Albanese was so ill he was taken to the emergency room and hospitalized. He was released after a few days, but his condition did not improve. M.J. complained of numbness in his hands and feet, and was referred to a neurologist for tests which demonstrated some sensory nerve deficit.

M.J. was hospitalized for the last time on May 9, 1981. He complained of vomiting, pain, and increasing numbness in his hands and feet, and his condition gradually deteriorated. Charles Albanese visited M.J. frequently. Dr. Miller testified that "[t]he one I remember most being there, almost hovering every day, was Charles." M.J. had skim milk at his bedside in order to alleviate the dehydration caused by the severe vomiting and diarrhea.

On May 15, 1981, Charles Albanese called Mr. Fishbein at home in the early morning hours. He told Fishbein that the doctors did not expect M.J. to live very long, and that he should prepare an amendment to the Allied Die Casting Corporation agreement as soon as possible, and get to the hospital. Dr. Miller testified that he was mystified by M.J.'s deterioration and certainly did not expect M.J. to die soon. Charles and Michael Albanese visited M.J. at the hospital that day, and the three men signed an amendment to the shareholder

agreement. This agreement promoted Charles to vice-president of Allied Die Casting Corporation. M.J. was in intense pain and strapped to the hospital bed. Michael was in a wheelchair, and he was so crippled he needed his wife's assistance to sign the agreement. M.J. Albanese died in the early morning hours of May 16, 1981. Joerg Pirl, forensic chemist, examined samples of M.J.'s hair and fingernails, and concluded that death was caused by arsenic poisoning, with sublethal doses administered over a four-month period, and a large lethal dose administered immediately prior to death.

Defense counsel theorized that M.J. might have received arsenic poisoning from an octopus meal consumed shortly before entering the hospital. The package of octopus was retrieved, and laboratory tests revealed that the arsenic in the octopus was within normal, nonlethal levels. Arsenic is a compound that is found as a trace element in many food items and in every person.

Laboratory tests revealed the presence of arsenic in the crumbs remaining in M.J.'s cookie jar. Charles Albanese testified that he often ate cookies out of M.J.'s cookie jar, and that he continued to do so after M.J.'s death. Charles was not able to explain how he had escaped the arsenic that had killed his father, nor was he able to satisfactorily explain why the cookie jar was left in his father's credenza. Charles explained that he continued to walk to his father's office every time he wanted a cookie, instead of moving the jar into his own office. Charles claimed there was no room in his office for a cookie jar.

Three kinds of fingerprints were detected on the cookie jar: Michael Albanese's, Charles Albanese's, and a third type that could not be identified. M. J. Albanese was never fingerprinted during his lifetime, so it was impossible to conclusively establish that the third type of fingerprints was his. His body was exhumed, but his fin-

gers were too decomposed to obtain fingerprints.

With M.J. dead, and Michael crippled and at home, Charles Albanese was in sole control of Allied Die Casting Corporation. His financial situation was still very serious and he began selling scrap metal and zinc, property of the corporation, to J. W. Reichel and Sons and to Clearing Smelting Corporation. Charles sold 88,000 pounds of zinc and $9,300 worth of scrap metal in these transactions. Charles insisted that the checks be made out to him personally or to cash, and he would not accept checks made out to Allied Die Casting Corporation. Charles received nearly $40,000 for these transactions. In November of 1981, when police began investigating the mysterious deaths in the Albanese family and visiting Allied Die Casting Corporation, Charles called Edward Cohen at Clearing Smelting and told him, "If anybody calls regarding any of our transactions, you know nothing of it."

Police investigators were unable to discover the presence of arsenic in hair and fingernail samples of employees at Allied Die Casting, or the presence of the poison at the Leisure Village complex. Charles Albanese was arrested in November 1981, shortly before he was to leave for a holiday in Jamaica with his wife and mother. Charles has not contested the theft charges stemming from the sale of the company scrap metal and zinc. His appeal is confined to the counts of murder and attempted murder.

At trial, Joe Reichel, vice-president of J. W. Reichel and Sons in Elkhorn, Wisconsin, testified that he talked with Charles Albanese in the autumn of 1979. Reichel testified that Charles told him he needed something to "get rid" of "some pests around the house." Reichel's company had a small quantity of arsenic which was used for a plating process. Reichel brought Charles a small Tupperware container of arsenic a few weeks after the

conversation. Charles requested more arsenic about two weeks later, and Reichel brought Charles a small baby food jar containing arsenic.

Charles Albanese testified that he needed the arsenic because he had recurrent problems with pests around the house. He testified that he put the arsenic out at night near the garbage container because pests had been getting in there at night, and he found garbage strewn all over his lawn. Charles did not adequately explain why he would put a lethal poison out where household pets and children could reach it, rather than obtaining garbage cans with lids instead of the uncovered containers he used as receptacles.

One of Albanese's neighbors, Pat Marshall, testified at trial. She stated that there had been problems with pests in the area, but that the problems did not begin until the spring of 1980. Both Pat Marshall and Virginia Albanese testified that the Albanese's garbage was strewn all over the lawn in the spring of 1980. Thus, Charles Albanese obtained the arsenic at least four months before the garbage and pest problem described by the other witnesses.

Charles testified at trial that he did not poison anyone. He accused his brother Michael of poisoning M.J. Charles further testified that Michael poisoned himself so it would appear that Charles was the criminal. Charles was not able to explain how Michael could have administered the fatal dose to M.J. on May 15, 1981, when Michael was so crippled he could barely hold a pen in his hand.

Charles testified that Michael was the architect of the clandestine sale of zinc and scrap metal. Charles stated that he paid Michael cash because his brother was so crippled he could not sign checks. Charles was unable to explain how his brother signed his paychecks during the period of his most severe paralysis.

Charles denied being present at Allied Die Casting on September 8, 1980, shortly after he was demoted, and the day Michael had his first attack of vomiting. Charles was presented with a series of checks and order forms that he had signed on September 8, 1980, but he explained that he must have put the wrong date on all of the documents and signed them on a different day. Charles could not establish that Michael had seen Mary Lambert and Marion Mueller shortly before their deaths. He conceded that Michael had not profited from the deaths of the two women. When asked who had profited, Charles said, "I did, my wife did."

While Charles was an inmate at McHenry County jail awaiting trial, he made the acquaintance of another inmate, Marty Nathan. Nathan testified that Charles asked him "*** if I knew anybody that would take care of some people for him *** and then he said·like about some money for like $10,000 on a first payment and like 10 or 20 on a second one. And I took it and—you know, thinking that he meant to have them killed." Nathan testified that Charles wanted to have his brother Michael and Joe Reichel, the man who supplied Charles with arsenic, killed while he was in jail. Nathan did not receive any money from Charles, but Nathan agreed to mail some letters for Charles when he was discharged from prison.

At trial, Charles admitted that he wrote a letter in prison that attempted to implicate Michael in the poisoning deaths and that he had Marty Nathan mail copies of the letter to his mother, his wife, the plant supervisor at Allied Die Casting, and his uncle, Frank Albanese. The letter was admitted into evidence, and stated:

> "Joe Reichel and Charles' brother, Mike, he used me to kill those people and set up Charles. The containers Joe gave Charles had powdered sugar with a little arsenic, just enough to get rid of the animals.

Michael almost took too much by trying to make himself look like a victim. The police followed the clues just as we set them up. Mike set up the phony theft. Now they tried to double cross me. That was their first and last mistake they ever made."

Joseph J. Lesk, a document examiner, gave expert testimony concerning this letter. He testified that it was written by Charles Albanese, but that Albanese had tried to disguise his handwriting so it would appear that someone else had written it. Charles did not adequately explain why he attempted to falsify such a letter and then admit in open court that he had written it.

The jury found Charles Albanese guilty as charged and ordered the death penalty after a sentencing hearing. The theft charges are not the subject of this appeal, but the defendant raises 19 issues in support of his argument that the conviction for murder should be overturned and the case remanded for a new trial.

## ALLEGED HEARSAY STATEMENTS OF
## A. DONALD FISHBEIN

Defendant argues that this court should order a new trial because damaging hearsay testimony was introduced by A. Donald Fishbein, attorney for Allied Die Casting Corporation. The allegedly objectionable testimony concerned a meeting of the board of directors on September 4, 1980. Fishbein attempted to describe what M. J. Albanese had said at that meeting, and an objection was raised by the defense attorney. The following statement was made by the trial judge during the course of the sidebar conference:

"I think—you have got a conference here and I think the State is entitled to at least elicit from Mr. Fishbein the fact that M.J. was the one who wanted this change *** what the change was. Without getting into his conversations as to—as to things in the company. But that isn't

going to stop Mr. Fishbein, Mr. Fishbein is subject to your cross-examination and anything he said can come in."

The attorneys continued to argue about the pending objection until they reached the following compromise:

"MR. FLORO [State's Attorney]: Let me ask Mr. Kelly something, Your Honor. Dick, if you don't feel that I can get in M.J.'s conversation, would you object to my leading Fishbein to some extent away from it?

MR. KELLY [Defense Counsel]: No.

MR. FLORO: In simply saying—

MR. KELLY: No. I think he's intelligently—I think he's intelligent enough to know where you are going to go—

MR. FLORO: I'll just ask him—

MR. KELLY: —without telling the exact substance of the conversation.

MR. FLORO: I'll simply ask him was there—who instigated this meeting, how did it come about, M.J. wanted it. Without going into specific conversations, what was the purpose of the meeting? All right?

MR. KELLY: All right.

MR. FLORO: Conversation regarding the internal structure, he was unhappy with Charles. All right. Do you remember the conversation you had and—with Chuck and what Chuck had to say? All Right.

What did Chuck have to say: He didn't understand what was going on, he asked his father what do you want. And did you have a conversation with Chuck? All right? I'll lead him not completely out of it, but I'll lead him away from the specific conversation.

MR. KELLY: That would appear to cure any error."

When the trial was resumed in the presence of the jury, the judge sustained the objection as to M.J.'s conversation but overruled it concerning "everything else."

Mr. Fishbein resumed his testimony, and the following statement became part of the record without an objection from the defense attorney:

"After M. J. Albanese had made a rather lengthy presentation to Chuck, Chuck said to M.J., what are you trying to say, Dad? At which point I interjected, and in effect clarified and somewhat amplified what M.J. had said. I explained to Chuck that in effect, Chuck, your dad is telling you that he is very unhappy with the arguing between you and he, he is very unhappy with your criticism of him, he doesn't want you to work in the plant anymore, he doesn't want you to be under the same roof with him, he doesn't want you to be an employee anymore of the corporation. That doesn't mean you can't be a shareholder or president or director because he has no power to do that, but he is taking this action as Chairman of the Board of Directors to terminate your employment and terminate your compensation from the corporation as an executive employee."

No objection was raised to this testimony, and alleged errors at trial not preserved by objection are normally waived for purpose of appeal (*People v. Carlson* (1980), 79 Ill. 2d 564, 575-76), but we will consider the merits of this issue because of the magnitude of a death penalty case.

We note first that to qualify as hearsay, the evidence must be offered for the truth of the matter asserted, rather than for some other purpose. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 121; 6 Wigmore, Evidence sec. 1766 (Chadbourn rev. ed. 1976).) In the case at bar, whether M.J. intended to fire Charles or not is of peripheral importance; the important factor is the state of mind of the defendant. We agree with the State's contention that Fishbein's testimony was not offered for the truth of the matter asserted, but for a nonhearsay purpose (see E. Cleary & M. Graham, Illinois Evidence sec. 801.1 (3d ed. 1979)).

We next consider defendant's contention that Fishbein's testimony concerning his own out-of-court statements constituted reversible error. First, Fishbein's out-of-court statements closely parallel the statements made by M.J.

that we have held to be admissible to demonstrate Charles Albanese's state of mind rather than for the truth of the matter asserted. Second, Fishbein's description of the new composition of the board of directors was independently corroborated by an exhibit admitted into evidence at trial. We therefore conclude that the trial court did not err in permitting Fishbein to testify concerning the events at the September 4, 1980, meeting.

*People v. Collins* (1971), 49 Ill. 2d 179, does not support defendant's theory on this issue. *Collins* states that prior, out-of-court, *contradictory* statements are admissible as substantive evidence only for impeachment purposes. (49 Ill. 2d 179, 197-98.) We are not faced with this question in the case at bar. Fishbein's testimony in court is consistent with the statements made at the September 4, 1980, meeting. Furthermore, we have held that the purpose of the offer of Fishbein's out-of-court statements was to establish Charles' state of mind. The statements were not offered for the truth of the matter asserted.

### CAUTIONARY INSTRUCTIONS INVOLVING THE TESTIMONY OF MARTY NATHAN

During the course of the trial, defense counsel objected to the testimony of Marty Nathan concerning Charles Albanese's desire to "take care of" Michael Albanese and Joe Reichel. The objection was overruled, and this evidentiary ruling has not been contested on appeal. However, defendant now argues that the trial judge should have approved a jury instruction stating that the testimony of Marty Nathan should be considered with caution, and that the failure to include such an instruction justifies a new trial. Such an instruction was tendered by defense counsel, but rejected by the trial judge.

Marty Nathan was not an accomplice to any of the crimes for which Charles Albanese was being tried. Defendant's relatives were dead long before Nathan en-

countered Charles Albanese in prison. Thus, it is inaccurate to refer to Marty Nathan as an accomplice of the defendant. (See *People v. Hrdlicka* (1931), 344 Ill. 211, 221-22; *People v. Wilson* (1977), 66 Ill. 2d 346, 350.) Nathan's testimony was thoroughly probed on cross-examination, and the jury was free to believe his testimony or disregard it.

The defendant argues that Nathan's testimony was uncorroborated, but, when Charles Albanese testified, he admitted writing the letters that Nathan mailed. It is true that Charles Albanese did not corroborate Nathan's testimony concerning Albanese's desire "to take care" of Michael Albanese and Joe Reichel, but the jury was certainly able to observe the demeanor of Albanese and Nathan and to weigh their relative credibility without a cautionary jury instruction.

Defendant provides authority to support his argument, but *People v. Devin* (1982), 93 Ill. 2d 326, is not applicable to the facts in the case at bar. In *Devin*, we vacated the death sentence of an individual after uncorroborated testimony was introduced concerning Devin's sociopathic tendencies. The testimony in *Devin* was extremely prejudicial; it included detailed descriptions of Devin's favorite forms of torture killing, which related to the *modus operandi* in the murder he was charged with. In *Devin*, the testimony was totally uncorroborated; here, we have Charles Albanese's partial corroboration of Nathan's testimony. Finally, in *Devin*, we noted that the objectionable testimony concerned the defendant's fantasies, rather than any description of Devin's conduct. 93 Ill. 2d 326, 349.

Defendant also argues that Nathan was his accomplice in the crime of obstructing justice. Defendant was sentenced to death for the murder of his relatives, not for obstructing justice, and the trial judge properly rejected defense counsel's request for a cautionary instruction concerning Nathan's testimony. Illinois law does not re-

quire such an instruction. (*People v. Devin* (1982), 93 Ill. 2d 326, 349-50 (Underwood, J., concurring in part and dissenting in part).) The prosecutor's comment on Nathan's testimony was justified because it was based upon evidence introduced at trial. *People v. Williams* (1962), 26 Ill. 2d 190, 194.

## EXPERT TESTIMONY

Defendant maintains that the trial court erred in allowing Rudolph Schaefer, an accountant called as an expert witness by the State, to give an opinion concerning the financial condition of Charles Albanese prior to the deaths of his family members. Schaefer reviewed voluminous mortgage papers, bank deposit slips, and cancelled checks from 1979 to 1981. Schaefer presented his findings to the jury with the aid of charts and testified that Charles Albanese had been in "critical financial condition." Defense counsel objected to this opinion, but the objection was overruled.

The defense contends that such opinion testimony impermissibly invaded the province of the jury because the jury could have evaluated Albanese's financial condition without the assistance of an expert. The defense argues that *People v. Crawford Distributing Co.* (1978), 65 Ill. App. 3d 790, *aff'd* (1979), 78 Ill. 2d 70, supports the contention that Schaefer should not have been allowed to give his opinion to the jury. The *Crawford* court stated that "where original evidence consists of numerous documents which cannot conveniently be examined in open court and the facts to be proved are calculations made from an examination of the documents, a witness capable of making the examination and calculations may testify to the results thereof." (65 Ill. App. 3d 790, 797.) In *Crawford*, the expert did not give an opinion concerning the documents (65 Ill. App. 3d 790, 798), but the court did not rule out expert opinion in all cases. Such a ruling would vitiate the use of expert testimony and burden the jury with complex analy-

sis beyond the ability of the average person.

In *Miller v. Pillsbury Co.* (1965), 33 Ill. 2d 514, 516-17, this court stated:

"Such evidence does not usurp the province of the jury, since the jury does not have to accept the witness's opinion. Further, such evidence is essential to aid the jury in drawing the proper inferences from the raw physical facts."

In the case at bar, it is unreasonable to expect the jury to examine hundreds of pages of complex financial documents and make accurate computations concerning fund transfers, cash flow and liquidity, to determine the financial condition of Charles Albanese. The defense offered its own expert witness who testified that Albanese was not in critical financial condition. The jury was free to balance the testimony of the two experts in reaching its verdict. The testimony of Schaefer did not invade the province of the jury and does not justify a new trial.

## CLOSING ARGUMENT

Given the consequences of a death penalty case, it is crucial that a prosecutor avoid inflammatory comments or mischaracterization of evidence during closing argument. The defendant maintains that the prosecutor's comments constitute reversible error because of their prejudicial effect on the jury. The defense specifically objects to the prosecutor's description of how Charles Albanese obtained arsenic from Reichel. The prosecutor described the conversation as follows:

"Reichel said I got some chemicals back there. I have some sodium cyanide, potassium cyanide. I think I've got some arsenic. The defendant said, I'll take that; I'll take the arsenic."

The trial judge sustained the objection raised by defense counsel, and the prosecutor continued:

"If what I tell you is not what the evidence was, certainly disregard it. But you certainly can recall the evidence. If I should misquote the evidence, I assure you it is not intentional. You recall, think back. The cyanide was passed up. Cyanide acts much more quickly you know. A couple of minutes and you're down. It, also, leaves the smell of bitter alum [*sic*]. Remember that?"

Reichel's version of the conversation is slightly different:

"Q. Do you recall when that occurred?

A. Was a couple years back, I believe in late '79.' I had a phone call from Chuck. He knew we did plating some time back and he stated to the fact that he had some pests around his house, animals in his garbage and doing some damage around his house. He asked me if I had any chemicals left from plating that he could possibly use to get rid of his pests.

I said I had a number of different chemicals in the house, yes, I named off a few [*sic*] which one was arsenic.

Q. What were some of the others? Do you recall?

A. We had sodium cyanide, zinc cyanide, copper cyanide. They were all used in our solutions when we did plating.

Q. You also named arsenic?

A. And arsenic.

\* \* \*

Q. After this conversation where the defendant and you talked about arsenic, what did he say during this conversation?

A. He asked if he could have some of it. And knowing Chuck for the number of years I did—

Q. If he could have some of what?

A. Arsenic.

Q. All right.

Then what happened?

A. I told him, 'All right.' "

The language used in the prosecutor's closing statement

slightly embroidered the conversation between Charles Albanese and Reichel, but a comparison of the language used by the prosecutor and the actual testimony reveals that the difference was insignificant. The trial judge properly sustained the defense counsel's objection to this statement, and no error resulted from this portion of the trial. See *People v. Stahl* (1962), 26 Ill. 2d 403, 406.

We do not agree with defendant's assertion that the prosecution misstated the evidence in rebuttal, thereby severely prejudicing defendant's chances for an acquittal. The prosecutor is entitled to comment on the evidence but not misstate it. It is true that the prosecutor referred to Charles Albanese's conversation with Reichel, but defense counsel's contemporaneous objection was sustained by the trial judge, and the prosecutor dropped this argument and moved to a different topic.

Next, the defendant argues that the prosecutor's characterization of circumstantial evidence constituted reversible error. During closing argument, the prosecutor noted:

> "Now circumstances that are known as circumstantial evidence—once they're laid down, they can't be changed. They are forever. Testimony can be changed to fit the need. So in many ways circumstantial evidence is the best evidence."

The prosecutor was attempting to get a conviction in a case based on circumstantial evidence, and we see no error in telling the jury that this type of evidence is sufficient to sustain a conviction (*People v. Taylor* (1972), 6 Ill. App. 3d 335, 340). Moreover, such evidence has been held sufficient to sustain convictions in similar cases argued before Illinois courts. In *Hoch v. People* (1905), 219 Ill. 265, the defendant, posing as a widower, advertised for a wife in a Chicago newspaper. The defendant married a woman who responded to the advertisement, and she gave the defendant all of her money. She became sick the week of the wedding and died. The day of her death, the defendant proposed to

the affluent sister of the deceased, who accepted his proposal. Another sister of the deceased became suspicious, and the defendant fled to New York, where he was arrested with arsenic in his possession. An autopsy revealed that defendant's deceased wife had died of arsenic poisoning. The defendant was found guilty of murder, and this court noted:

> "There cannot be any reasonable doubt that Marie Walcker Hoch came to her death from arsenic administered through the criminal agency of some person, and all the facts and circumstances pointed directly to the defendant as the criminal agency." 219 Ill. 265, 285-86.

In *People v. Hanei* (1980), 81 Ill. App. 3d 690, the defendant arrived at his parents' house and offered his father a choice of donuts. His father selected a cherry donut, and complained that it tasted bitter. The defendant's father began vomiting shortly thereafter, and he died the next day. An autopsy determined the cause of death to be thallium poisoning. A laboratory test of the remaining donuts revealed the presence of thallium. Five years before, an acquaintance of the defendant had died after eating a cake left on her fencepost, and the defendant acquired the friend's property after her death. Her body was exhumed, and the autopsy revealed that thallium poisoning was the cause of her death. A search of defendant's house revealed a mortar and pestle containing thallium, and a copy of the book *Pale Horse* by Agatha Christie, a murder mystery involving thallium poisoning. Defendant was convicted of murder, and the conviction was affirmed by the appellate court. (81 Ill. App. 3d 690, 708.) The circumstantial evidence pointing to Charles Albanese is even more compelling than the evidence in *Hoch* and *Hanei*.

Defendant's final argument concerning the prosecutor's closing statement concerns the prosecutor's allusion to the "changing" testimony of the defense. The remark was objected to and sustained, and the prosecutor made no allu-

sion to the fabrication of evidence as alleged by defendant. The prosecutor merely reviewed the various theories advanced by defendant and demonstrated how they were flawed. The prosecutor is entitled to comment on the evidence presented at trial if those inferences are based upon evidence. (*People v. Williams* (1962), 26 Ill. 2d 190, 194.) We conclude that the prosecutor's closing argument was devoid of reversible error and cannot be used as the basis for a new trial.

## JUROR HANDBOOK

Defendant argues that he was deprived of a fair sentencing hearing because the jurors received a juror handbook that gave them the impression they would not have to render a sentence at the conclusion of the trial. The clerk of the court distributed a small pamphlet entitled "Handbook for Illinois Jurors" which contained the following passage:

> "The jury must not be concerned with what penalty may be imposed if the defendant is found guilty. The law requires that the judge sentence the defendant."

This handbook was still in the possession of the jurors after the guilty verdict was returned, and before the sentencing phase of the trial was presented to the same jury.

The defendant submits the affidavit of jury foreman Lynn L. Lazerson. The affidavit states that the jury was surprised to hear at the end of the sentencing hearing that it would have to render a sentence. A jury verdict cannot be impeached by the allegation that one of the jurors was confused by the juror handbook. (See *People v. Brinn* (1965), 32 Ill. 2d 232, 248.) Furthermore, each member of the jury was examined in accordance with *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, and they were apprised of their sentencing responsibility. The apparent confusion caused by the distribution of the juror handbook has been considered by this court in

the past and has not been found to be reversible error. In *People v. Izzo* (1958), 14 Ill. 2d 203, 209, this court noted:

"No litigant has a right, constitutional or otherwise, to have his case tried before ignorant jurors. To acquaint the juror with his duties and responsibilities in a new environment and to increase his understanding of the processes of a trial can hardly be objectionable in itself. There is no way of knowing what misconceptions might exist in the absence of an official explanation. *** The possibility of misinformation can be reduced if not eliminated by careful preparation; and in any case the value of generally sound orientation in getting rid of antecedent misconceptions is so great as to outweigh any minimal inaccuracies that would be likely to occur."

The defendant's argument that the jury was inattentive as a result of the handbook's distribution is pure conjecture. Both attorneys commented in closing argument that the jury was one of the most attentive they had ever seen. The alleged confusion on the part of the jurors does not justify a new trial.

### OTHER ISSUES

Defendant contends that it was error to instruct the jury to consider defendant's potential for rehabilitation when the only sentencing alternatives were the death penalty or life imprisonment. However, potential for rehabilitation is a constitutionally mandated factor to be considered by the sentencing authority. (*People v. Taylor* (1983), 115 Ill. App. 3d 621, 623.) Such an instruction is designed to give the defendant the benefit of any possible doubt as to the incorrigible nature of his character, and it was proper for the jury to be given such an instruction.

Defendant also argues that the jury should have been instructed that it was not necessary to prove the existence of a mitigating factor beyond a reasonable doubt in order to decide against the death penalty. There is no compelling reason to invalidate the jury instructions on appeal. The

jury was repeatedly told that the State had the burden of proof, and it is unnecessary to establish a burden-of-proof requirement in each jury instruction. If anything, such an instruction could confuse the jurors and make it more difficult for them to weigh mitigating factors in reaching a decision on the death penalty. See *People v. Free* (1983), 94 Ill. 2d 378, 427.

We are not persuaded by defendant's argument that the qualification of jurors pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, produced a jury that was biased in favor of the prosecution. We addressed this question in *People v. Lewis* (1981), 88 Ill. 2d 129, 147, and the defendant has not provided any new authority that suggests our holding in *Lewis* was erroneous. In the case at bar, the jury was chosen according to the standards set down by the United States Supreme Court, and we cannot detect a constitutional infirmity that justifies a new trial.

We next consider the defendant's argument that it was error for the prosecutor to tell the jury that Charles Albanese should be given the death penalty because he persisted in his plea of not guilty and did not show remorse for his crimes. Defense counsel misconstrues the prosecutor's remarks as an impermissible comment on the defendant's silence. Although impermissible comment on a defendant's silence raises serious constitutional questions (*People v. Ramirez* (1983), 98 Ill. 2d 439), we are not confronted with such a scenario. Charles Albanese took the stand in his own defense, and the prosecutor's remarks during closing argument merely focused on the defendant's lack of remorse:

> "He denies his guilt. You've seen no repentance. I think repentance is the first step towards rehabilitation, an acknowledgment of guilt. I'm sorry. He denies that. Can this person be rehabilitated. I would submit to you No."

The defendant's remorse is a proper subject for consid-

eration at sentencing (*People v. Morgan* (1974), 59 Ill. 2d 276, 282), and the prosecutor's comments on this subject were constitutionally permissible.

Defendant argues that testimony stating that 62% of the American public favors the death penalty was unduly prejudicial. Melvin Douglas, an expert in criminal justice at McHenry County College, was called as a witness by the defense to prove that the death penalty was an immoral form of punishment. When cross-examined by the State's Attorney, Douglas stated it was his opinion that the death penalty was immoral, but he conceded that 62% of the American public did not agree with his assessment. The prosecutor briefly referred to this statement during closing argument.

Although a defendant is entitled to a trial where the jurors' passions are not aroused by inflammatory statements (*People v. Ramirez* (1983), 98 Ill. 2d 439; *People v. Szabo* (1983), 94 Ill. 2d 327, 363-64), we find no error in the prosecutor's reference to the testimony of the defense witness. The prosecutor was entitled to persuade the jury that the death penalty was a reasonable form of punishment, just as defense counsel was entitled to argue the opposite. Prosecutors must exercise extreme caution in capital cases to avoid overly prejudicial or inflammatory comments, but such a level was not reached in the case at bar.

Defendant's next argument is similarly erroneous. It was not error for the trial judge to instruct the jury that the alternative to the death penalty was imprisonment, without explaining that life imprisonment was the only statutory alternative to the death penalty. This argument is irrelevant because the jury was only responsible for choosing whether the death penalty was applicable, not the severity of a prison sentence should the death penalty be found to be inappropriate.

We do not agree with defendant's contention that the jury instructions dealing with mitigating factors were in er-

ror. Counsel for the defendant agreed with the instructions submitted to the jury, and we can detect no error in the portion of these instructions dealing with mitigating factors. The following instruction was given:

> "Mitigating factors are any facts or circumstances that provide reasons for imposing a sentence less than the death penalty. Mitigating factors may include that the defendant has no significant history of prior criminal history. Or the defendant may be rehabilitated or restored to useful citizenship."

The description of mitigating factors is merely illustrative. The jury is not limited to consideration of prior criminal history or rehabilitation. This jury instruction is consistent with prior holdings of this court in *People v. Carlson* (1980), 79 Ill. 2d 564, 590, *People v. Garcia* (1983), 97 Ill. 2d 58, 86, and the United States Supreme Court (*Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991). The instruction was designed to allow the jury to consider any facts or circumstances mitigating against the death penalty.

Next, defendant argues that the Illinois death penalty statute is unconstitutional because: (1) the statute does not require the sentencing authority to make written findings of aggravating and mitigating circumstances; (2) the statute permits consideration of nonstatutory aggravating factors; (3) the sentencing discretion represents an unconstitutional delegation of legislative and judicial authority. These issues have been repeatedly analyzed and rejected by this court, and the defendant has not provided any reasoning or authority to justify reversing our prior rulings on these issues. See *People v. Kubat* (1983), 94 Ill. 2d 437, 501-02, 504; *People v. Free* (1983), 94 Ill. 2d 378, 428; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531.

Defendant also maintains that the cumulative effect of the alleged errors deprived the defendant of a fair trial. This argument is without merit. The whole can be no

greater than the sum of its parts, and defendant has failed to demonstrate anything approaching reversible error in the myriad of arguments offered to justify a new trial. While it is true that trial errors may have a cumulative effect when considered together (*People v. Killian* (1976), 42 Ill. App. 3d 596, 601), the defendant has failed to establish this in the case at bar.

Finally, the defense argues that the evidence which remains when objectionable material is discarded is insufficient to prove Albanese guilty beyond a reasonable doubt. However, the evidence points us in exactly the opposite direction. The State has clearly established that Charles Albanese plotted and carried out the murder of his own family members for financial gain. We accordingly affirm the judgment, including the death sentence, of the circuit court of McLean County. The clerk of this court is directed to enter an order fixing Friday, September 28, 1984, as the date on which the sentence of death entered in the circuit court of McLean County is to be executed. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of this order shall be furnished by the clerk of this court to the Director of Corrections, to the warden at Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*

JUSTICE SIMON, concurring in part and dissenting in part:

I concur in the majority's judgment that the State has proved beyond a reasonable doubt "that Charles Albanese plotted and carried out the murder of his own family members for financial gain." (102 Ill. 2d at 83.) I dissent, however, from the majority's decision to affirm the sentence of death. I believe that the comments on the sentencing proc-

ess contained in the juror handbook and the prosecution's reliance on the defendant's lack of remorse as an aggravating factor were both reversible error; and I would reverse the death sentence and remand for a new sentencing hearing.

The Death Sentence Violated the Eighth Amendment
Because the Incorrect Information Contained in the
Juror's Handbook Resulted in an Inattentive, Mis-
informed Jury at the Defendant's Sentencing Hearing.

The United States Supreme Court "has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination. In ensuring that the death penalty is not meted out arbitrarily or capriciously, the Court's principal concern has been more with the *procedure* by which the State imposes the death sentence than with the substantive factors the state lays before the jury as a basis for imposing death, once it has been determined that the defendant falls within the category of persons eligible for the death penalty." (*California v. Ramos* (1983), 463 U.S. 463, 992, 77 L. Ed. 2d 1171, 1179, 103 S. Ct. 3446, 3451.) The court has required that the States adopt standards and procedures that channel jury discretion and offer guidance to the jury on the factors that the State considers relevant to the decision of whether a defendant shall live or die.

Any practice that diverts the jury's attention from its principal role in the death sentencing process undermines the entire system of procedural and substantive protections established by the Constitution. Even if constitutional, such practices are bad policy and should not be condoned by this court. *Cf. State v. Jones* (1979), 296 N.C. 495, 501, 251 S.E.2d 425, 429 (a prosecutor's comments on appellate review and the executive's power to commute the death penalty are improper because they reduce the jury's sense of

responsibility in the sentencing hearing); see also *Farris v. State* (Tenn. 1976), 535 S.W.2d 608, 614; *People v. Morse* (1964), 60 Cal. 2d 631, 652-53, 388 P.2d 33, 46-47, 36 Cal. Rptr. 201, 214-15; *Fleming v. State* (1977), 240 Ga. 142, 146, 240 S.E.2d 37, 40.

In this case the jury was mistakenly informed that it "must not be concerned with what penalty may be imposed if the defendant is found guilty. The law requires that the judge sentence the defendant." (102 Ill. 2d at 78.) These comments were contained in a pamphlet entitled, "Handbook for Illinois Jurors," which was distributed to all jurors who served at the defendant's trial.

The majority contends that "[t]he defendant's argument that the jury was inattentive as a result of the handbook's distribution is pure conjecture." (102 Ill. 2d at 79.) This contention glosses over the sworn statement of the foreman of the jury who said:

"That as a result of the dissemination of this information, the consensus of the jury was that they would not have to determine whether the death penalty should be imposed on the defendant and it was not until they were instructed *after the sentencing hearing* that they realized that this was to be their responsibility, which surprised most or all of the jurors." (Emphasis added.)

The foreman's uncontradicted statement establishes that most of the jurors had read the statement on the jury's lack of responsibility for sentencing and that they had believed it.

Knowing this, it defies human experience to assume that the jury was as attentive at the sentencing hearing as it would have been if it had not been misinformed. Counsel's comments in closing arguments on the attentiveness of the jury reflect nothing more than traditional courtship of the jurors. The brief verbal questions in *voir dire* on the jurors' attitudes towards the death penalty did not put them on notice as to their responsibilities and surely were

not considered as carefully by the jurors as the written handbook that they could refer to at any time during the trial or the sentencing hearing.

The majority correctly observes that this court has approved of the concept of a juror's handbook (*People v. Izzo* (1958), 14 Ill. 2d 203, 209), even though the handbook may contain "minimal inaccuracies" which do not prejudice the defendant. Prior to this case, however, this court has never held it permissible for the State to convey substantively inaccurate information to the jury by such devices. Surely this court would reverse the imposition of the death penalty if the judge had instructed the jury that they need not pay close attention to the evidence presented at the death penalty proceeding. I can conceive of no reason why the State's role in misleading the jury should not have the same result here.

The Prosecution's Reliance on the
Defendant's Decision Not to Confess at the
Sentencing Hearing as an Aggravating Factor in
the Sentencing Decision Violated Illinois Law.

The defendant elected not to testify at the sentencing hearing even though he had previously testified during the trial and asserted his innocence. In closing arguments at the sentencing hearing the prosecutor emphasized the defendant's continued reliance on his plea of not guilty as a reason for imposing the death penalty:

> " 'He denies his guilt. You've seen no repentance. I think repentance is the first step towards rehabilitation, an acknowledgment of guilt. I'm sorry. He denies that. Can this person be rehabilitated. I would submit to you No.' " (102 Ill. 2d at 80.)

This statement was improper under Illinois law and warrants a new sentencing hearing.

The Illinois Supreme Court does not require attorneys seeking reinstatement after disbarment to admit their guilt

of the crimes that were the basis for their disbarment. (See *In re Wigoda* (1979), 77 Ill. 2d 154, 159-61; *In re Kuta* (1981), 86 Ill. 2d 154, 161.) This rule is based on the view that "[s]imple fairness and fundamental justice demand that the person who believes he is innocent though convicted should not be required to confess guilt to a criminal *act* he honestly believes he did not commit" (*In re Hiss* (1975), 368 Mass. 447, 458, 333 N.E.2d 429, 437); otherwise, honest persons, professing their innocence, may receive greater punishment than perjurers who admit to a crime that they did not commit.

There is stronger reason for applying the same principles in the case of a criminal defendant instead of compelling him to confess at a sentencing hearing or to suffer the accusation of a lack of remorse, especially where the sentencing hearing is about life or death. Our criminal justice system cannot ignore that a jury's determination of guilt is not infallible and that defendants convicted long ago have on many occasions been exonerated on a showing that they were the victims of unjust accusation. If anything, we should take even greater precautions in the criminal context to avoid jeopardizing the defendant's privilege against self-incrimination. *Cf. Pope v. State* (Fla. 1983), 441 So. 2d 1073, 1078 ("We have held that lack of remorse is not an aggravating factor ***. [R]emorse is an active emotion and its absence, therefore, can be measured or inferred only from negative evidence. This invites the sort of mistake which occurred in the case now before us—inferring lack of remorse from the exercise of constitutional rights. *** Any convincing evidence of remorse may properly be considered in mitigation of the sentence, but absence of remorse should not be weighed either as an aggravating factor nor as an enhancement of an aggravating factor").